THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR PETERS, Defendant-Appellant.

(No. 60851; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

First District (1st Division)—October 20, 1975.

Lynn Sara Frackman, of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

On February 10, 1972, a sporting goods store in Berwyn was the scene of an armed robbery during which the proprietor was shot to death.

Arthur Peters (defendant) was indicted for armed robbery (Ill. Rev. Stat. 1971, ch. 38, par. 18—2) and murder (Ill. Rev. Stat. 1971, ch. 38, par. 9—1) and for attempt murder (Ill. Rev. Stat. 1971, ch. 38, par. 8—4) of two police officers at the scene of the robbery. After a jury trial, the defendant was found guilty of armed robbery, murder and of both attempt murders. He was sentenced to 100 to 300 years for murder; a concurrent sentence of 10 to 20 years for armed robbery; and concurrent sentences of 10 to 20 years for each attempt murder. As will later be discussed, there is an inconsistency between the common law record and the report of proceedings as to whether the last two sentences are to be served concurrently with or consecutively to the first two sentences. The defendant has appealed.

The defendant does not raise any point regarding the sufficiency of the evidence, except his sanity when the offenses were committed. Our review of the record indicates that there was ample evidence to sustain all of the convictions. Therefore, we see no need to discuss the facts in detail, but will summarize them at this point. If discussion of the defendant's contentions requires more detailed facts, we will state those facts as necessary.

On February 10, 1972, a Berwyn police officer received a radio message and proceeded to the sporting goods store. He found the door locked but saw the owner, Frank Posejpal, in the store. He was handing boxes to some person who was not visible. As the officer turned away from the store, he heard two shots. He turned and saw the defendant unlock the door. The officer drew his gun and entered the store for a moment, but left when the defendant pointed a small caliber automatic pistol at him. The officer heard additional shots fired from in back of the store. From behind his car, he could see defendant inside. Another officer had arrived and was directed to the rear of the store. There he found three men and an automobile with the motor running and the trunk open. He identified defendant's son (codefendant John Peters) as the person seated behind the wheel. The younger of the other two men was carrying boxes of ammunition to the car. The third man, who was walking behind the other, was later found to be carrying a 9-millimeter automatic pistol. These three men attempted to flee but were all arrested. During this process two shots were fired at the officer from inside the store. The trunk of the car contained a quantity of shotguns, pistols and ammunition, all identified as having been taken from the store.

A number of other police officers arrived. They used a loudspeaker to tell the defendant to surrender. They also exchanged gunshots with the defendant, who remained in the store. Finally, they fired tear gas into

the store. After additional calls from the police, the defendant threw a pellet gun out of the front door and surrendered. While he was in the store, the defendant had called a reporter for a local radio station and expressed his desire to surrender to the police. The reporter called the police station in an effort to accomplish this.

Upon entering the store, the police found the owner dead of a gunshot wound. There was no one else inside. A search by the police disclosed a hidden .25-caliber automatic pistol wedged in between a shelf and the rear wall. The evidence showed that this gun and the 9-millimeter pistol carried by one of the men arrested were both purchased from the sporting goods store by a third party and turned over to defendant. Expert testimony established that the store owner was killed by one bullet which entered the back of his neck at the left side. In the opinion of the expert, the gun was held about one foot from the victim. Ballistics testimony showed that the fatal bullet came from the .25-caliber pistol found hidden in the store. Two .25-caliber shell casings fired from this same gun were found in defendant's home.

Defendant testified that he had no recollection of the entire incident. He stated that he had drunk two quarts of vodka at a friend's house at 4 o'clock that morning. At that time he took about 300 milligrams of drugs per day. On rebuttal, this friend testified that defendant came to her home about 8 a.m. that day and asked to borrow her car. He did not drink two quarts of vodka or take pills or drugs in her presence that day. In her opinion, he did not appear intoxicated then and was not under the influence of any type of drugs. He drove her to work that day in her car. She observed nothing unusual about his driving or his behavior. He spoke coherently to her.

Defendant's son, 18 years old at the time of trial, testified that defendant came to his home at about 9:30 a.m. In his opinion his father was then intoxicated. He drove his father, a friend and the latter's son to two bars. The two older men spent about half an hour in each place. The younger men waited in the car. The four men then drove to the home occupied by the son and his mother. The son then drove the car to the front of the sporting goods store where the two older men entered. The son, with the other young man in the car, drove to the rear of the store. In sum, in our opinion the evidence is patently overwhelming beyond reasonable doubt to prove guilt of the defendant, subject only to the issue of his sanity which remains to be considered.

The defendant contends that the trial court abused its discretion by refusing to grant a mistrial after an unauthorized approach to the jury; the trial court's refusal to grant defendant a change of venue due to pretrial publicity resulted in a trial before a prejudiced jury; the trial court

erred by refusing to allow defense counsel to directly question prospective jurors; the trial court erred by refusing to excuse for cause five jurors who showed prima facie likelihood of bias; the State failed to prove defendant's sanity beyond a reasonable doubt; and the consecutive sentence imposed on defendant was excessive under the Unified Code of Corrections.

The State responds that it met its burden of proving defendant's sanity beyond a reasonable doubt; the pretrial publicity did not require a change of venue; the court's examination of prospective jurors did not prejudice defendant; the trial court properly denied challenges for cause to jurors who did not show any interest, bias or prejudice; the court properly denied defendant's motion for a mistrial because the defendant was not prejudiced by the unauthorized approach to the jury; and defendant's sentence should be modified so that the terms run concurrently.

Defendant's first contention is concerned with an alleged unauthorized approach to the jury. One day during the trial, at the close of all the evidence and immediately after a lunch recess, the court was informed by a deputy sheriff that, as the jury was passing across a parking lot to its lunchroom, two young men sitting in front of the County Jail spoke to them and repeated the words, "not guilty" three times. The other deputy sheriff escorting the jury heard one of the men say, "Not guilty, not guilty and I know one of the women on the jury." The two men were brought before the court but denied that this incident had occurred. The court then had the jurors brought into open court and, by collective questioning, ascertained that six of the individual jurors had heard comments by the two men. The court asked the jurors collectively if there was anything about the incident that affected them in any manner, one way or another, and if they heard anything else and received negative answers. One juror remarked that he paid no attention and another juror said that he had not seen the two men. The court then instructed the jury that the incident had nothing to do with the case.

Counsel for the defendant made a motion for mistrial which was denied. Defendant now urges that the court should have polled the members of the jury individually as to whether they heard the comments or were prejudiced. No motion was made to this effect nor was this procedure suggested to the court.

■■ Counsel for defendant concede here that the trial court has broad discretion in determining whether a mistrial will be declared. In support of this statement they cite *People v. D'Argento,* 106 Ill.App.2d 36, 41, 245 N.E.2d 501. This decision involved a request for mistrial by defense counsel based upon the fact that a jurior told the court that he had received a telephone communication from an anonymous caller who said,

"I want you to find those fellows guilty." The juror advised the court that this incident would have no effect on his impartiality. This court stated the established and accepted principle that "an unauthorized communication to a juror does not, of itself, render a fair trial by an impartial jury impossible. It is necessary to show that the unauthorized communication in some way prejudiced the defendant." (106 Ill.App.2d 36, 40.) In support of this principle this court cited *People v. Berry*, 18 Ill.2d 453, 459, 165 N.E.2d 257, *cert. denied*, 364 U.S. 846, and *People v. Williams*, 38 Ill.2d 115, 126, 230 N.E.2d 224.

The defendant actually cites no Illinois authority to the contrary other than *People v. Tilley*, 406 Ill. 398, 94 N.E.2d 328. There, an intoxicated sister-in-law of one of the jurors approached them in a restaurant. She was prevented by the bailiff from communication. She then made remarks in the presence of the entire jury including the statement, "If I was on that jury I would free him." We note in *Tilley* that other charges of irregularities in the handling of the jury were made. In addition, *Tilley* reversed the conviction not so much because of the incident in the restaurant but because of the cumulative effect of additional trial errors which the court discussed and found prejudicial so that the defendant did not in fact have a fair and impartial trial. We do not regard *Tilley* as a departure from the principle above expressed nor as authority for defendant's contention.

We find other cases which strongly support the general principle set out by this court in *D'Argento* and the other authorities therein cited. (*People ex rel. Walker v. Pate*, 53 Ill.2d 485, 505, 292 N.E.2d 387; *People v. Rettig*, 50 Ill.2d 317, 318, 319, 278 N.E.2d 781, *cert. denied* 409 U.S. 895, citing a number of authorities including *Berry* and *People v. Coniglio*, 353 Ill. 643, 655, 184 N.E. 799.) We note also the statement in *Williams* that the logic of the rule is applicable aside from individual factual distinctions in the cases. (38 Ill.2d 115, 126.) Applying this thinking to the case before us, we see nothing in the record which shows any prejudice to the defendant as a result of the incident. In the absence of such showing, we reject defendant's contention.

On March 15, 1973, defendant filed a motion for change of venue outside of Cook County on the ground of prejudicial pretrial publicity. (Ill. Rev. Stat. 1973, ch. 38, par. 114—6.) The motion was supported by copies of a number of newspaper articles. It is difficult to summarize these items. A good number of them gave more or less accurate accounts of the commission of the crime. One article regarding an alleged statement by defendant's son, John Peters, was printed more than a year before trial actually commenced. Other articles mentioned defendant's criminal past but this was raised in a number of instances at trial by the testimony

of psychiatrists and of defendant himself. In addition, at least part of this publicity was engendered by defendant's own conduct. At one point, when the store was surrounded by the police, defendant called a radio station on the telephone and conducted a long conversation with someone there. This "encouraged and contributed to the publicity" of which defendant now complains. See *People v. Yonder*, 44 Ill.2d 376, 386, 256 N.E.2d 321, *cert. denied*, 397 U.S. 975.

■■ In considering defendant's contention that this newspaper coverage prevented him from having a fair trial in Cook County, it must first be noted that the crime was committed on February 10, 1972. A complaint was filed against defendant on that date and defendant was indicted on April 3, 1972. After this, the court had occasion to rule on a number of substantive matters before the motion was filed on March 15, 1973. The trial judge passed upon various motions such as for continuances and involving discovery and also conducted a hearing with a jury regarding competency of the defendant to stand trial. Virtually the same situation was involved in *People v. Yonder*, 44 Ill.2d 376, 256 N.E.2d 321. The court there held that, "[s]uch a motion which is filed after the trial court has ruled on matters going to the merits of the case comes too late." 44 Ill.2d 376, 387.

Other factors show the invalidity of defendant's contention. The principle is strongly established that determination of the issues in this type of request for change of venue rests within the sound judicial discretion of the court to determine from all applicable facts and circumstances whether defendant has actually been prejudiced by the publicity in question. This principle is set forth in each of the three cases most strongly relied upon by defendant. (*People v. Keegan*, 52 Ill.2d 147, 155, 286 N.E.2d 345; *People v. Hryciuk*, 5 Ill.2d 176, 184, 125 N.E.2d 61, and *People v. Murawski*, 394 Ill. 236, 240, 68 N.E.2d 272.) None of these decisions is applicable here. In each of them the allegedly prejudicial publicity which the jurors had access to occurred during the trial. In the case before us, the major portion of the alleged offending publicity occurred long prior to trial. Also, as above indicated, we have examined the articles in question here and conclude that the trial court acted well within the bounds of reasonable discretion in denying the motion.

The authoritative cases in Illinois all agree that the passage of time between the publicity and the date of trial is an important consideration. Many cases in Illinois have held that, where a number of months elapse between the date of publication and the date of trial, there is no reasonable cause for change of venue. In *People v. Madison*, 56 Ill.2d 476, 309 N.E.2d 11, four months were involved; *People v. Bixler*, 49 Ill.2d 328, 275 N.E.2d 392, *cert. denied* 405 U.S. 1066, slightly over three months;

*People v. Gendron,* 41 Ill.2d 351, 243 N.E.2d 208, *cert. denied,* 396 U.S. 889, six months; *People v. Berry,* 37 Ill.2d 329, 226 N.E.2d 591, four months. In the case at bar, outside of a definitely innocuous article which appeared in March of 1973, no newspaper article discussing the case appeared after January 3, 1973, some four months prior to trial.

■■ The court took cognizance of this situation during the *voir dire* examination. The entire venire of 59 jurors was questioned about whether they had read pretrial publicity. Only four of the jurors gave an affirmative answer. Of these four, two were excused for cause and the remaining two by peremptory challenges. The record, therefore, has a strong affirmative showing that defendant was not prejudiced in the slightest by pretrial publicity so that his motion for change of venue was properly denied.

Defendant raises two contentions directed at impaneling of the jurors. On *voir dire* examination, the trial court advised the attorneys that he would conduct the examination himself, but, he would put to the jury any additional questions which counsel for either side wished to submit, touching upon ability to serve as qualified jurors. Counsel for defendant took exception to this procedure on the ground that it prevented defendant from having proper representation by his counsel. The defense attorney apparently suggested one question to be put by the court to one juror. Under Supreme Court Rule 234, as it then existed (Ill. Rev. Stat. 1971, ch. 110A, par. 234), the trial judge was to initiate the examination, and parties, or attorneys, were to "be allowed a reasonable opportunity to supplement such examination * * *."

■■ This same contention regarding alleged curtailment of *voir dire* examination has been raised in a number of cases. The ruling in all of them is uniform that there is no prejudicial error without evidence that defendant's attorney was "'prevented from discovering any fact or reason why a prospective juror might be biased or lack the essential qualifications for service as a juror in the case.'" (*People v. McClellan,* 29 Ill. App.3d 712, 331 N.E.2d 292, leave to appeal denied September 26, 1975, quoting from *People v. Turner,* 27 Ill.App.3d 239, 242, 326 N.E.2d 425, quoting in turn from *People v. Carruthers,* 18 Ill.App.3d 255, 261, 309 N.E.2d 659. See also *People v. Green,* 30 Ill.App.3d 1000, 333 N.E.2d 478, and *People v. Etten,* 29 Ill.App.3d 842, 331 N.E.2d 270.) We can find in this record no evidence of any prejudice or bias to defendant as a result of the manner in which the trial judge conducted the examination. Defendant has pointed out no such evidence.

The contention of defendant in this regard actually is that the court erred in refusing to excuse five jurors for cause. These instances involve a juror whose son was a police officer; a woman whose husband was a

former Chicago police officer prior to retirement and whose nephew and brother were members of the Chicago Police Department; a man who had testified as a State's witness three years previously before the same judge, and two of the individuals, as above noted, who had read newspaper accounts some time before trial. Each of these prospective jurors stated that they could and would act fairly and that they would not be influenced. At the request of counsel for defendant, the court advised two of these five that the police officers involved in the attempt murder cases were with the Berwyn police force. The jurors then reiterated that they had the ability to and would give both sides a fair trial.

■■ In *People v. Cole*, 54 Ill.2d 401, 298 N.E.2d 705, the Supreme Court set forth the general principles that the party making a challenge for cause must show the existence of a state of mind in the juror that will raise a presumption of partiality and that determination of whether the prospective juror does, or does not, possess "the state of mind which will enable him to give to an accused a fair and impartial trial rests in the sound discretion of the trial judge." This determination will not be set aside on review "unless it is against the manifest weight of the evidence." (54 Ill.2d 401, 413, 414.) In *Cole*, two justices of the Supreme Court dissented on the ground that the determination made by the trial judge was against the manifest weight of the evidence.

We need not consider the weight of the evidence in the case before us. None of these five prospective jurors whom defendant challenged for cause actually served. All of them were rejected by peremptory challenges by the defense. In addition, defendant here was tried with his son, John Peters. Each of them was entitled to 6 peremptory challenges because at the time of the trial capital punishment was no longer imposed. Therefore, the defendants together were entitled to a total of 12 peremptory challenges. (Ill. Rev. Stat. 1971, ch. 38, par. 115—4(e).) The court allowed them 20. Thus, even deducting the 5 used in disposing of the jurors challenged for cause, defendants received more challenges than the law provided. We note also that the evidence of guilt in this case was strong to the point of being overwhelming. Defendant has not challenged the sufficiency of the evidence in this appeal, aside from his own sanity. The only defense interposed by defendant's own testimony was voluntary intoxication and the use of drugs which had completely destroyed his memory of the occurrence. The selection of the jury did not prejudice defendant's right to a fair trial.

The issue of defendant's sanity was submitted to the jury under instructions which are not criticized. Defendant urges that the evidence was insufficient upon a theory that it was incumbent upon the State to prove his sanity beyond a reasonable doubt. (Ill. Rev. Stat. 1973, ch. 38, par.

3—2; *People v. Childs*, 51 Ill.2d 247, 256, 281 N.E.2d 631.) In the case before us, we need not consider sufficiency of the evidence presented by defendant concerning his lack of sanity because the State accepted this issue as tendered by defendant and offered evidence tending to prove sanity at the time of the commission of the offense. See *People v. Redmond*, 59 Ill.2d 328, 320 N.E.2d 321, and dissenting opinion.

The defendant called a qualified and licensed psychiatrist who had examined him about October 3, 1972. The examination consisted of questions and answers and observation of defendant's behavior and took about one hour. From notes made at the time, the witness testified in general to the questions put and the responses received from defendant. The witness testified that defendant was, in his opinion, suffering from an organic brain problem manifested by poor memory and judgment. In his opinion, this condition could be caused by a congenital brain defect and a variety of other causes including alcoholism and drug use. The patient had indicated to the doctor that he had been using alcohol heavily, as well as drugs. The witness then stated his opinion that defendant was a schizophrenic, addicted to alcohol and drugs who "may have been incompetent to understand the nature of his crime or to control his behavior * * *." In his opinion, defendant may not have appreciated the criminality of his conduct at the time the crime for which he was on trial was committed (February 10, 1972) as well as prior crimes. The doctor defined "schizophrenic" as a type of psychosis or mental illness in which a person is out of touch with reality.

The State called a qualified psychiatrist who had examined the defendant about December 6, 1972. This examination consisted of questions and answers as well as observation of defendant and a hearing of a tape transcript of the telephone conversation between defendant and a radio news reporter at the scene and time of commission of the crime. The examination itself lasted some one hour and three quarters or two hours. This witness described defendant as having an antisocial personality hallmarked by callousness, disregard for others and general guiltlessness. He described defendant as the type of person who might commit a crime and then would not feel any remorse or guilt for his conduct. In his opinion, defendant could conform his conduct to the standards of the law. His opinion was based on a study of the background of the crime, his examination of defendant and the taped conversation. He expressed the opinion that defendant was not suffering from a mental defect or a mental illness per se and he would not classify defendant as a schizophrenic. He classified defendant as having an antisocial personality with paranoid and explosive elements but concluded that defendant was suffering from a personality disorder and was not legally insane.

Analysis of this testimony shows that the witness for defendant lacked certainty in his diagnosis as he stated only that defendant may have been incompetent to control his behavior because of schizophrenia. On the contrary, the witness for the State was positive and direct in his diagnosis of the existence of a personality disorder as distinguished from a mental illness. In this regard it should be noted that evidence of a personality disorder, irresponsible conduct or a mental disturbance do not justify a reasonable doubt of sanity. (*People v. Lono*, 11 Ill.App.3d 443, 449, 297 N.E.2d 349, and cases there cited.) Furthermore, the jury was justified in accepting the far stronger testimony of the expert called by the State.

Defendant objects to the testimony of the State psychiatrist on the ground that he had examined the defendant for purposes of the competency hearing held before trial. This objection was made at trial by defendant and overruled. The point is renewed here on a theory that the standards and tests for insanity and competency to stand trial are entirely different. (Compare Ill. Rev. Stat. 1973, ch. 38, pars. 6—2 and 1005—2—1.) This court has had occasion to consider and reject this same contention. *People v. Zemola*, 9 Ill.App.3d 424, 429, 292 N.E.2d 195.

Another important factor is the conduct of defendant as disclosed by the testimony concerning commission of the crime. Defendant had planned this crime in advance. The details had been carefully arranged with an adult accomplice and there was an extremely rational motive; namely, the commission of an armed robbery for defendant's financial benefit. (See *People v. Count*, 106 Ill.App.2d 258, 246 N.E.2d 91.) Defendant's conduct in other respects was rational, calculating and shrewd. While holding the police at bay, he contacted the news reporter and showed ingenuity in obtaining his assistance in arranging a safe surrender. He admitted to the reporter that he had participated in armed robbery but denied that he had murdered the owner. This denial of guilt at the scene of the crime, coupled with simultaneous acceptance of guilt for a lesser offense, raises a strong implication that defendant understood the criminal nature of his conduct and was attempting to drive the best possible bargain for himself. *People v. Turner*, 2 Ill.App.3d 11, 14, 15, 275 N.E.2d 742.

The testimony by defendant that he could not recollect commission of the crime cannot be considered as evidence of insanity. (*People v. Lono*, 11 Ill.App.3d 443, 449, 297 N.E.2d 349.) This testimony is refuted by the fact that defendant attempted to protect himself by hiding the gun with which he had killed the store proprietor, as well as by his refusal to surrender when accosted by one single police officer and his capitulation when he was surrounded by armed men and the store was filled with

tear gas. Defendant was aware that he was committing a crime and he was well able to control his actions.

■■■ We conclude that the evidence of sanity was strong beyond a reasonable doubt. We will add, parenthetically, that the defendant's attempt to prove his involuntary intoxication cannot assist him. This testimony was rebutted by a witness for the State and voluntary intoxication in and of itself, whether caused by alcohol or drugs, is not a defense unless it completely negates the existence of a necessary criminal intent. See Ill. Rev. Stat. 1973, ch. 38, par. 6—3; *People v. Walcher*, 42 Ill.2d 159, 246 N.E.2d 256.

The final point raised by defendant pertains to the imposition of consecutive sentences. As shown, there is some doubt as to whether the sentences actually imposed were to be consecutive or concurrent. The common law record shows that defendant was sentenced to 100 to 300 years for murder, 10 to 20 years for armed robbery, and two sentences of 10 to 20 years each for the attempt murders, all sentences to run concurrently. On the contrary, the report of proceedings shows that the court pronounced the murder sentence to be concurrent with the armed robbery sentence and the two sentences for attempt murder to be concurrent with each other but consecutive to the sentence for the murder.

Prior to the imposition of sentence, on June 28, 1973, defendant elected to be sentenced under the Illinois Unified Code of Corrections which had become effective on January 1, 1973. At that time the Code provided that the aggregate minimum period of the consecutive sentences should not exceed twice the lowest minimum term authorized for the most serious felony involved. (Ill. Rev. Stat., 1973 Supp., ch. 38, par. 1005—8—4(c).) Under this statute the greatest permissible minimum would be twice 14 years or 28 years. Effective July 1, 1974, this statute was amended to provide that the aggregate minimum should not exceed the highest minimum term for the two most serious felonies involved. (P. A. 78-939, see Cumulative Annual Pocket Part, Ill. Ann. Stat. ch. 38, § 1001—1—1 *et seq.*, at 102 (Smith-Hurd 1975-1976).) See *People v. Williams*, 60 Ill.2d 1, 16, 17, 322 N.E.2d 819; also *People v. Gill*, 29 Ill.App.3d 356, 330 N.E.2d 552.

■■ The State objects to fixing the minimum under the law as it was in effect upon the date of sentence and takes the position that all of the sentences should run concurrently in accordance with the common law record. In view of all of the circumstances in this case, including the defendant's record for previous crimes of violence, it is our opinion that the sentences should be modified to conform to the common law record so that all will run concurrently. Despite the apparently high minimum

term of the murder conviction, the defendant will be eligible for parole after he has served 20 years less time credited for good behavior, presently a total of 11 years and 3 months. (Ill. Rev. Stat. 1973, ch. 38, par. 1003—3—3(a)(1).) A sentence of that type will, in our opinion, be closer to the principle and spirit of the indeterminate sentence as well as conforming to the common law record. See *People v. Harper*, 50 Ill.2d 296, 301, 278 N.E.2d 771.

Accordingly the judgment appealed from is modified so that the sentences of 100 to 300 years for murder, 10 to 20 years for armed robbery and the two sentences for attempt murder, each from 10 to 20 years, will all be served concurrently. As thus modified the judgment is affirmed.

Judgment affirmed as modified.

BURKE, P. J., and SIMON, J., concur.