THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HERMAN MUSKGROVE, Defendant-Appellant.

Third District    No. 75-386

Opinion filed December 3, 1976.

Julius L. Echeles, of Chicago, for appellant.

Alan Bruggeman, Assistant State's Attorney, of Joliet, for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Defendant Herman Muskgrove appeals from a judgment of the Circuit Court of Will County, following a jury trial, in which he was found not guilty of attempted murder but guilty of armed violence. The trial court sentenced him on the armed violence conviction to a term of from 18 to 54 months in the penitentiary. The charge originally was attempted murder by slashing James Neiles with a knife, in violation of sections 8—4(a) and 9—1(a)(1) of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, pars. 8—4(a) and 9—1(a)(1)), and with armed violence for having committed an aggravated battery upon Neiles on the same date while armed with a dangerous weapon, a knife, in violation of sections 33A—2 and 12—4(a) of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, pars. 33A—2 and 12—4(a)). Both counts referred to the same occurrence.

It appears from the record that defendant sought to lease certain business premises for use as a restaurant from complainant as a prospective lessor. On March 6, 1974, defendant and an associate were at the premises, cleaning and fixing the interior. Neiles arrived to lock up the premises at the end of the day. Defendant and Neiles were about to discuss arrangements for the proposed lease in Neiles' automobile, when Neiles left the automobile for a few minutes to talk to another tenant. When Neiles returned to the automobile, defendant tendered $500, the first month's rent, but Neiles did not want to accept payment at that time, for the reason that he did not have any receipts available. He noticed that defendant had a roofing or linoleum knife in his hand but was not alarmed because this was a working tool with which defendant had been working at the premises. Defendant insisted upon making payment for the first month's rent, so Neiles reached into his pocket for a pen, with which to write a makeshift receipt on a business card. Defendant then cut Neiles on the face and chest with the tool. Neiles fled from the automobile and defendant pursued him. Defendant forced Neiles to the ground and continued to slash at Neiles' head, neck and back. An unidentified man pulled defendant off of Neiles and Neiles ran away bleeding.

After Neiles had gotten away, police officers chanced upon the scene and observed defendant brandishing the cutting tool and surrounded by a crowd of onlookers. A police officer ordered defendant to drop the cutting tool and defendant then dropped the knife, and himself fell to the ground. Police officers described defendant's conduct at the scene and shortly thereafter as "irrational." Defendant was quoted as saying such things as "Why doesn't somebody kill me, I ain't nothing but a no good mother-fucking nigger and a dope fiend." The police caused defendant to be removed from the scene by ambulance "because of the state of the subject."

After the indictment was returned, defendant moved to dismiss the armed violence count of the indictment on the ground that the statutory scheme permitting the prosecutor to charge either armed violence, a nonprobationable offense, or aggravated battery, a probationable offense, upon the same set of facts is unconstitutional. The trial court denied defendant's motion.

Defendant moved *in limine* to preclude the use as evidence against him of certain statements he made at the scene, on the ground that they contained prejudicial admissions of unrelated criminal conduct. The trial court also denied this motion.

At the trial it was shown that Neiles suffered severe lacerations requiring 67 stitches. Medical evidence, photographs and the physical appearance at the trial demonstrated the permanent nature of injuries to Neiles.

Defendant did not contest commission of the act of cutting Neiles. Defendant did, however, interpose the affirmative defense of insanity, and did contest whether the instrument used in cutting Neiles was a "dangerous weapon" as charged in the indictment.

At the trial, the prosecution offered two occurrence witnesses, the complainant Neiles and one Albert Longman. Albert Longman was called as a witness and testified that he was a clerk and had lived in Will County for 15 years. At this point defendant objected to Longman's further testimony on the ground his address had not been given. The trial court overruled the objection and Longman proceeded to testify to the occurrence. On cross-examination, defense counsel asked Longman for his present address. The State's objection to this question was sustained.

Certain evidence was introduced at the trial concerning defendant's insanity defense. Mrs. Cox, defendant's sister, with whom he had lived, testified that defendant had not been "himself" for several weeks prior to the incident. As noted previously, defendant's behavior at the scene was described as "irrational," and defendant was removed from the scene by ambulance. Shortly after his arrest, in a hospital waiting room where the police transported him, defendant attempted to strike a stranger with an ash tray, and attempted to disrobe. At that time, defendant referred to a police officer as a dope pusher.

A police officer, called as a defense witness, testified that on March 7, 1974, the day after defendant's arrest, he observed defendant in the lockup when defendant had disrobed and had defecated and urinated other than in the toilet facilities provided in the cell. Mrs. Cox, defendant's sister, testified that she visited defendant at the jail on March 7, 1974, and that defendant then had his clothes off and was talking about preaching to serve God. She testified that defendant was not a minister. Mrs. Cox described defendant's conduct as nervous and unlike his usual self prior to his arrest. Defendant's nephew, Dennis Jones, also testified to defendant's unusual behavior on March 7, 1974.

Defendant was twice admitted as a voluntary patient at St. Joseph's psychiatric unit in March and April 1974. His initial hospitalization lasted for a period of 10 days and the second hospitalization was for a period of 3 days. Defendant's discharge, at the end of each visit, was "against medical advice." Dr. Alex Spadoni was the treating psychiatrist who worked with defendant during both voluntary stays. On March 9, 1974, when defendant was first admitted, Dr. Spadoni found defendant to be demonstrating:

> "Symptoms of suspiciousness, distrust, he was suffering from delusion of not a persecution, not only did he feel that people wanted to harm him, wanted to get him, although he did not mention any specific person or group that was after him, but he

also displayed what we call delusions, feeling that he was especially appointed by God to be God's messenger here on earth in order to convert other people. He also appeared to be suffering from auditory hallucinations, in other words, hearing voices."

During the treatment, Dr. Spadoni was informed of defendant's history of illicit drug use, but after observing him for a few days became reasonably certain that he was dealing with a truly mentally ill person, rather than somebody who was high on drugs.

The doctor testified that on both admissions to St. Joseph's, defendant was suffering from "a mental illness diagnosed as paranoid schizophrenia with an underlying personality disturbance * * * diagnosed as antisocial type personality." He also said "it is very rare for schizophrenia to develop in a matter of hours, or days." In response to a hypothetical question, Dr. Spadoni testified that defendant was suffering from paranoid schizophrenia on March 6, 1974, the date of the incident in question. The doctor, however, was unable to state, with a reasonable degree of medical certainty, whether on that date such mental disease did or did not render defendant unable to appreciate the nature of what he was doing or to conform his behavior to law. Dr. Spadoni did testify that schizophrenia could not have been caused by defendant's participation in the criminal acts charged in the prosecution.

On March 12, 1974, defendant was restrained to his bed with key-locked leather restraints, a precaution not taken with all patients. During both stays at the hospital, defendant received supportive psychotherapy and antipsychotic medication. The medication caused a marked improvement in defendant's initial mental confusion, and considerable improvement in his irrational ideas, ideas of persecution, and ideas about being a messenger of God.

The expert witness for the State, Dr. Meyer Kruglik, who was appointed to examine defendant and interviewed him for two hours on April 20, 1974, testified that defendant was suffering from an inadequate personality structure, which is not a mental disease, but a personality disorder. In Dr. Kruglik's opinion, defendant was legally sane on March 6, 1974, and was not, on that date, suffering from any mental disease or defect causing him to lack substantial capacity either to appreciate the criminality of his conduct or to adhere to the requirements of law. Dr. Kruglik testified, however, that a treating psychiatrist is in a better position than an examining psychiatrist to give a diagnosis, and also admitted at the time he examined defendant and formed his opinion as to defendant's condition, he was unaware of Dr. Spadoni's diagnosis of defendant, unaware of certain of the details of defendant's treatment at St. Joseph's, and uninformed of the reported observations of doctors and staff personnel at St. Joseph's.

The jury found defendant guilty of armed violence and not guilty of attempted murder. The trial court denied defendant's post-trial motion for a new trial and, after stating that the offense of armed violence was nonprobationable, the trial court sentenced defendant to 18 to 54 months imprisonment.

■■ It is first contended that the evidence was insufficient to sustain defendant's conviction beyond a reasonable doubt, in the face of defendant's insanity defense. As we had stated in *People v. Felton* (3d Dist. 1975), 26 Ill. App. 3d 395, 398, 325 N.E.2d 400:

> "Insanity is an affirmative defense. (Ill. Rev. Stat. 1973, ch. 38, par. 6—4.) Once the defense introduces evidence of insanity, the presumption of sanity no longer prevails and the State must prove, beyond a reasonable doubt, that at the time of the commission of the crime the accused was legally sane. (*People v. Hawkins* (1972), 53 Ill. 2d 181, 290 N.E.2d 231.) To rebut the presumption of sanity and to place the burden of proving otherwise on the State, evidence must be presented which tends to prove insanity sufficient in character to create a reasonable doubt of sanity at the time of the offense. *People v. Skeoch* (1951), 408 Ill. 276, 96 N.E.2d 473."

In considering the sufficiency of the evidence produced by the State on the issue of insanity, we stated in the *Felton* opinion (at pages 398-99):

> "In the words of the Illinois Supreme Court in *People v. Ford* (1968), 39 Ill. 2d 318, 321, 235 N.E.2d 576:
>
> > ' * * * the question of insanity is one for the jury to decide [citation], and we will not disturb the jury's finding unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice.' "

The expert witness for the defendant only stated that defendant may have been incompetent to control his actions because of schizophrenia, but was unable to state that defendant was unable to appreciate what he was doing or to conform his conduct to law. The State provided an expert witness who is positive and direct in his diagnosis of the existence of a personality disorder as distinguished from mental illness, and understood the criminality of his acts and could adhere to requirements of law. The jury, therefore, could accept the expert testimony of the State's witness. (See *People v. Peters* (1st Dist. 1975), 33 Ill. App. 3d 284, 337 N.E.2d 716.) In view of the record as a whole, therefore, we would not be justified in concluding that the defendant's conviction was not proven beyond a reasonable doubt in light of the insanity defense.

■■ The second issue which is raised by defendant is the contention that statutory provisions, which permit the prosecutor to charge armed violence, a nonprobationable offense, upon facts identical to those

constituting aggravated battery, a probationable offense, is unconstitutional as applied in this case. We discussed this issue in *People v. Graham* (1975), 25 Ill. App. 3d 853, 856-57, 323 N.E.2d 441, and in that case we said:

> "Defendant argues that the prosecutor has absolute discretion to charge either the felony of armed violence or the misdemeanor of aggravated assault when the conduct involved is assault with a deadly weapon, and because of the right of the prosecutor to make such election defendant contends that the act violates equal protection of the laws, and that there is also an unconstitutional delegation of legislative power to impose penalties for criminal activities. This issue has been raised a number of times in this court and in the Illinois Supreme Court. The Illinois Supreme Court has held that where criminal conduct is prohibited by two different statutes, which provide different penalties, there is no constitutional problem in the prosecution of a defendant under the statute which provides the greater penalty. (*People v. McCollough*, 57 Ill. 2d 440, 313 N.E.2d 462 (1974), reckless homicide/involuntary manslaughter. See also *People v. Keegan*, 52 Ill. 2d 147, 286 N.E.2d 348 (1971), *cert. denied* (1972), 406 U.S. 964, indecent liberties with a child/contributing to the sexual delinquency of a child)."

After we had discussed the aggravated assault/armed violence statutory framework, we concluded in the *Graham* case, 25 Ill. App. 3d 853, 857:

> "It is clear that there is no constitutional infirmity in the legislative provision for both felony and misdemeanor penalties for the crime of assault with a deadly weapon, in the alternative sections considered in the instant case. (Section 12—2(a)(1) and 33A—2.)"

Defendant also argues that the statutory scheme effectively removes from the court's consideration various sentencing alternatives, and thus violates the separation of powers clause. While this argument was not explicitly considered in *Graham,* we implicitly had refuted this argument there. We conclude that it is clear that the legislature has consitutional power to specify to the judiciary, within proper bounds, the range of penalties for a given criminal offense. Where, as here, the legislature has constitutionally delegated to the prosecutor the power to specify that range of penalties, there is no constitutional infirmity.

■■ Defendant next contends that the introduction into evidence of defendant's statements at the scene, which statements contained admissions of what is asserted to be unrelated criminal conduct, deprived defendant of his federally guaranteed right to fair trial. We note that,

prior to trial, defendant moved *in limine* to preclude use as evidence of certain statements made by defendant at the scene on the ground that they contained prejudicial admissions of unrelated criminal conduct. The trial court denied the motion. Neither party to this appeal presents the trial court's rationale for making such ruling. The statement made by defendant, which we have quoted before, was: "Why doesn't somebody kill me, I ain't nothing but a no good mother-fucking nigger and a dope fiend." The State points out that defendant did not allege this error in his post-trial motion for a new trial and is thus precluded from raising this issue as grounds for reversal here, by force of *People v. Sanders* (1st Dist. 1976), 37 Ill. App. 3d 236, 345 N.E.2d 757. In *Sanders,* however, after stating the waiver rule, the court did proceed to determine that the alleged error, if it did exist, was harmless.

> "The general rule, of course, is that evidence of commission of other crimes by an accused, in addition to that for which he is on trial, is inadmissible unless its relevancy in placing a defendant in proximity to the time and place, aiding or establishing identity, or tending to prove design, motive or knowledge is so closely connected with the main issue as to justify admission." *People v. Cage* (1966), 34 Ill. 2d 530, 533, 216 N.E.2d 805.

See also *People v. Peters* (1st Dist. 1975), 33 Ill. App. 3d 284, 337 N.E.2d 716.

■■ In the case before us, we should note that being a "dope fiend" is not necessarily a crime. There exist many drugs, available either by prescription or over-the-counter purchase, which a person could take regularly so as to be a "dope fiend" and not commit any crime. It appears that Dr. Spadoni, the defense expert witness, testified on direct examination that defendant told him of defendant's history of illicit drug use. On a consideration of the record as a whole, however, we do not believe that the admission of such statement constitutes reversible error.

The further contention is made by defendant that introduction into evidence of defendant's exercise, shortly after his arrest, of his constitutional right to counsel, violated defendant's right to a fair trial. A police officer was called to the stand by the defendant and testified to defendant's irrational behavior in the jail on March 7, 1974, the day after the offense. On cross-examination by the State, it was established from the response of this witness that while the defendant was rambling on, one of the things he didn't ramble about was the fact that he wanted to talk to his lawyer and he asked for his lawyer by name. It was also developed that this was at a time when he was in a state of undress. The State also points out that this issue was not raised in defendant's written motion for a new trial and is, therefore, waived under the *Sanders* precedent hereinabove referred to. We have given consideration to similar issues and believe that

the appropriate basis of determining the propriety of evidence, unobjected to, which might be improper, is whether the ends of justice would be served by such consideration and whether in fact the evidence would require remandment. *People v. Johnson* (3d Dist. 1971), 2 Ill. App. 3d 965, 275 N.E.2d 649.

We are reminded that Judge Learned Hand stated in *United States v. St. Pierre* (2d Cir. 1942), 132 F.2d 837, 840:

> "It must be conceded that the privilege is to suppress the truth, but that does not mean that it is a privilege to garble it; * * * it should not furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition."

In the instant case, the defense raised the defense of insanity, and has elicited testimony of defendant's behavior. Part of that behavior included defendant's statements made in the presence of the police officer where he, among other things, called for his counsel. These statements were relevant to the evaluation of defendant's mental capacity and conduct at the time under consideration.

■■ Upon a review of the record and the nature of the statements made by defendant and in light of the fact that the issue was not raised in the motion for new trial and is raised for the first time on appeal, we do not believe that the ends of justice require a remandment by reason of the cross-examination to determine what was in fact said by defendant while he was presumably "rambling on."

Another issue raised by defendant is the contention that his right to confront witnesses was violated by the trial court's ruling, precluding defendant from inquiring as to the current address and employment of an occurrence witness. The address of Albert Longman, where he lived until two weeks prior to trial, was furnished to the defendant. Defendant is here alleging as error the trial court's rulings which allowed Longman to testify at trial without giving his current address or employment. Defendant does not appear to assert that cross-examination of Longman was hampered due to lack of preparation because of unavailability of Longman's address but simply asserts as error the impression conveyed to the jury, of harm which might be caused by defendant, by the trial court's ruling in this regard.

While the right of a cross-examination has been established, it is limited to "cases involving convictions essentially dependent upon the credibility of the witness being cross-examined." *People v. Shaw* (1969), 117 Ill. App. 2d 16, 20, 254 N.E.2d 604.

■■ Since defendant here did not contest the commission of the act of cutting the complainant Neiles, the case did not essentially depend upon the testimony of Longman and we see no reversible error in failing to give the current address of Longman.

■■ It is further contended on appeal that the testimony of the State's expert witness violated section 5—2—1(h) of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1(h)), by conveying to the jury the content of defendant's statements to the expert. Dr. Kruglik was appointed by the trial court to examine defendant prior to trial and to report to the court both as to his fitness to stand trial and as to his criminal responsibility at the time of the offense. It is contended by defendant in his brief that while the court sustained defense objections to testimony of the State rebuttal psychiatrist Dr. Kruglik making direct reference to statements made by defendant to Kruglik during the course of the court-ordered psychiatric examination, the doctor nonetheless testified to his own conclusions, which the jury necessarily must have realized were based on statements defendant had made to him. Mainly from the doctor's conclusions as to defendant's contrition and feelings of guilt, the jury must have realized he made incriminating statements to the doctor. In *People v. Williams* (1967), 38 Ill. 2d 115, 230 N.E.2d 224, the court considered the constitutional aspects of the application of what is now section 5—2—1(h) of the Unified Code of Corrections, and in that case the supreme court said at page 121:

> " * * * the prohibition * * * to be limited to 'statements' made by the accused while being examined which are offered for their truth as opposed to statements offered not for their truth but to show defendant's mental condition."

It is recognized in defendant's brief in the instant case that the trial court did sustain objections to statements made by defendant to the psychiatrist. Defendant has not alleged specifically, or proven, the admission of any statements which are objectionable under the *Williams* doctrine and we find no reversible error in the record to sustain such contentions.

■■ It is further contended that the trial court, in instructing the jury the bladed linoleum or roofing tool was a "knife" and "dangerous weapon" impermissibly removed a factual determination from the jury's consideration. The indictment in this case charged that defendant "while armed with a knife, which was a dangerous weapon, committed an aggravated battery." Over defense objection, the trial court instructed the jury that:

> "The expression dangerous weapon as used in the definition of Armed Violence includes a knife."

This instruction correctly states the law. (See *People v. Graham* (1975), 25 Ill. App. 3d 853, 323 N.E.2d 441.) The instruction given in the case, contrary to defense assertions, did leave for consideration of the jury whether the tool used by defendant was a knife. The instruction appears to be proper. No other instruction was quoted by defendant and the

failure to abstract all the instructions could be construed as a waiver. *Gillespie v. Norfolk & Western Ry. Co.* (4th Dist. 1972), 3 Ill. App. 3d 779, 278 N.E.2d 420.

■■ A final contention is made that defendant was not properly sentenced. Prior to March 5, 1975, armed violence was a probationable offense. Effective March 5, 1975, armed violence was an offense for which probation could not be granted. Apparently the trial court was of the opinion that probation could not be granted to defendant. Defendant maintains that because of the erroneous belief of the trial court, the case must be remanded for resentencing, and that any holding that probation was not available to defendant violates the ex post facto prohibition of the Federal and State constitutions. The trial court stated, apparently at the sentencing hearing:

> "The court would not have considered probation anyhow in view of the circumstances with this offense as it has been demonstrated by the testimony in the cause and the verdict of the jury."

It is, therefore, clear that even though the trial court may have misconceived the range of available dispositions, that misconception resulted in no discriminatory sentence. (*People v. Gaines* (1st Dist. 1974), 21 Ill. App. 3d 839, 316 N.E.2d 14.) The defendant additionally maintains that the trial court improperly considered hearsay and vague statements which were nonetheless damaging concerning complainant's testimony as to defendant's conduct toward him after the offense, and also certain statements by a probation officer as to the heat of community sentiment against defendant.

As stated by the court in *People v. Wilson* (1st Dist. 1973), 11 Ill. App. 3d 693, 696, 297 N.E.2d 277:

> " * * * the mere fact that a trial judge, before imposing sentence, is aware of certain inadmissible facts does not automatically insure a reversal of that sentence. The function of a reviewing court is not to determine whether the record is perfect, but to determine whether defendant had a fair trial. Where it can be said from the record that an error complained of could not reasonably have affected the result of the trial, the judgment of the trial court will be affirmed."

We believe that the complaints of defendant, do not raise issues of prejudice so as to affect the sentence imposed upon defendant or justify a reversal for resentencing.

For the reasons stated, therefore, the judgment and sentence of the Circuit Court of Will County in this case will be affirmed.

Affirmed.

STOUDER and SCOTT, JJ., concur.