(No. 38006.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WALTER RILEY, Plaintiff in Error.

*Opinion filed November 24, 1964.*

RICHARD A. COWEN, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED

G. LEACH and GEORGE W. KENNEY, Assistant Attorneys General, and ELMER C. KISSANE and LESTER A. BONAGURO, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

Upon being tried by a jury in the criminal court of Cook County, the defendant, Walter Riley, was found guilty of the murder of one Warren Rush, and was sentenced to the penitentiary for a term of 14 years. He comes directly to this court for review contending that the trial court erroneously admitted evidence obtained by the police in violation of his constitutional rights against unlawful search and seizure, that the jury was improperly instructed, and that the proof did not establish guilt beyond a reasonable doubt.

At about 11:00 P.M. on the night of September 29, 1959, the defendant, Rush, and a man named James Ellis were among those present in a Chicago tavern known as Woodland Liquors. Defendant, described by one witness as being intoxicated, was talking loudly and using vulgar language and had a short exchange of words with Rush, all of which prompted the tavern owner to tell defendant to leave the premises. He left peaceably and, at about two-minute intervals, was followed out of the tavern by Rush and Ellis in that order.

As Ellis reached the street, according to his testimony at the trial, he saw defendant holding an open knife in his hand and approaching Rush from the rear and observed as defendant struck three blows on Rush's head with the knife. With regard to his ability to see, Ellis stated that he was but a few feet away when the attack occurred and that lights from an elevated railroad structure illuminated the area. He saw no weapon in Rush's hand, and stated that he became excited and fled from the scene when he saw the blows struck. The police were called and the officers responding found Rush lying in the street and bleeding from a wound

on his head. They removed him to a hospital whose records noted that Rush was suffering from "multiple lacerations with arterial bleeding from left temporal laceration" at the time of admission.

Police officers assigned to investigate the incident first went to the hospital but were unable to talk with Rush because he was unconscious. The officers next went to the tavern and after talking to the owner and a bartender, went to an apartment where defendant resided. He was not home but, after an unsuccessful search of places defendant was known to frequent, the officers returned around 2:00 A.M. and found him in bed. Just how the officers gained admission to defendant's quarters is not clear, but it is conceded that they had neither a warrant for defendant's arrest nor a warrant to search the premises. In any event, they awakened defendant and identified themselves, and when they questioned him about the attack on Rush he denied any knowledge of the matter. When defendant indicated that he wanted to get dressed, one of the officers searched his clothing and discovered a bloodstained knife with the blade open in a jacket pocket. One of the handles was broken. Upon being confronted with the knife, defendant admitted that it was his and stated: "A man's got a right to protect himself. As you can see, it's just a little knife." Following this, defendant was taken to a police station where others having knowledge of the incident had been assembled and, upon seeing them, defendant remarked: "The guy must be dead, since all this is going on."

On the day following the attack, Rush was removed to the county hospital and records of the latter, received into evidence by stipulation, noted that he was unconscious and suffering from multiple lacerations. Other entries in the record stated: "Final diagnosis, brain laceration. * * * laceration sutured—1. Forehead; 2. neck region; 3. parietal." Rush died on October 18, 1957, and according to the testimony of the pathologist who performed an autopsy upon

his body, the victim had received three blows on the side of the head, estimated to have been received two to three weeks before. To use the words of the witness: "These blows were of sufficient severity to have caused a subdural hemorrhage and the softening of the brain on the opposite side which, in turn, put the man into a coma and he developed bronchopneumonia." In short, pneumonia which occurred as a direct result of the blows on the head was the immediate cause of death. The autopsy also revealed a well healed incision at the base of the neck, but it was the opinion of the pathologist that this wound had nothing to do with the death.

The knife referred to was admitted into evidence over a general objection, and it is defendant's position in this court that it was not admissible because it was obtained as the result of an unlawful search and seizure. However, since he made no motion to suppress the knife on such ground prior to trial, thus permitting no inquiry into the question of whether the search and seizure were in fact reasonable or unreasonable, those grounds for objection must be deemed to have been waived. We have consistently aligned ourselves with those jurisdictions holding to the rule that where no timely motion to suppress the evidence is made, it is admissible even though the product of an unlawful search and seizure. (*People* v. *Ikerd,* 26 Ill.2d 573, 581; *People* v. *Sotos,* 26 Ill.2d 460, 462-463.) Nor, as defendant collaterally suggests, can we arbitrarily state there was unfairness or that trial counsel was incompetent for not making a motion to suppress. From what appears in the record here, it would seem that the officers, as prudent men, had reasonable grounds to believe that a criminal offense had occurred and that defendant had committed it.

To sustain his charge that he was not proved guilty beyond a reasonable doubt, defendant contends, first, that the prosecution failed to prove that the blows inflicted by defendant caused the victim's death, and second, that improba-

bilities and inconsistencies in the testimony of Ellis, the sole eyewitness, renders his entire testimony unworthy of belief. We find, however, that little merit attaches to these arguments.

When the pathologist was cross-examined he replied in the affirmative to inquiries as to whether the subdural hemorrhage could be produced by the striking of the head on the curb or sidewalk, or by a blow from a fist, and defendant now insists that the inability of the pathologist to rule out that the hemorrhage had not been incurred in one of the ways suggested creates a doubt of guilt. The problem is entirely collateral. Even if the hemorrhage had its source in a fall or a blow from a fist, it is clear that defendant's criminal agency was responsible. Moreover, the doctor's testimony on direct examination to the effect that the hemorrhage had been produced by three blows to the head, (the same number Ellis saw struck,) was supported by his physical findings.

As previously noted, the pathologist stated an opinion that the blows to the head had been suffered two to three weeks prior to death, and it is defendant's contention that the outer limit of three weeks, which could be three or four days before the crime, creates doubt that the blows were inflicted by defendant. We do not agree. The precise date the blows were struck could not be determined by autopsical examination, and when the doctor's time estimate is laid beside the testimony of Ellis that three blows were struck and the evidence produced by the autopsy, we cannot say that a reasonable doubt exists.

Seizing upon isolated questions, it is asserted that Ellis contradicted himself as to whether he was in front of or behind Rush when the attack occurred, and even as to whether he was in the tavern when defendant was ejected. However, even without singling out the factors which corroborated Ellis, a reading of his entire testimony reveals no inconsistency in either respect. Rather, it appears that he was in

fact present and standing but a few feet from the deceased when the attack occurred. Similarly, we see no inherent improbability in the testimony of Ellis that lights from the elevated tracks gave some illumination. Although counsel asks us to take judicial notice that the elevated tracks are unlighted, it is also a matter of common knowledge that stations, stairs and advertising thereon are illuminated.

When the tavern owner was called as a witness at the coroner's hearing he protested stating: "If I thought I was going to be a witness and cross-examined, I'd have brought my attorney along. You know, because I have a business and this man is trying to build up a case against me. I wasn't there and I didn't see anything and I don't know anything." And although defendant sees the last sentence as a fatal contradiction to the tavern keeper's trial testimony as to the occurrences inside the tavern, we do not believe this is so. Apart from the fact it is obvious the witness sought to evade testifying before the coroner in order to protect himself from laying the foundation for a civil suit, his presence and views of what occurred inside the tavern were corroborated by Ellis.

Looking to all of the testimony, together with defendant's remarks about having the knife to protect himself and that "the guy must have died," we are satisfied that his guilt was established beyond a reasonable doubt, and that there is no justification for a refusal to abide by the verdict of the jury.

Defendant next contends the trial court erred in giving to the jury five instructions, all relating to the law of self-defense, wherein controverted facts are purportedly assumed to be true. Stated differently, it is his theory that the instructions permitted the jurors to assume that defendant had in fact killed the deceased, or that defendant had in fact been guilty of a wrongful act. Two of the instructions, however, were given at the behest of the defense, and two others were given with defendant's agreement and ac-

quiescence. It is axiomatic that an accused cannot complain of error acquiesced in or invited by him, and to this end we have held that a defendant may not complain of defects in instructions which were given at his request, (*People* v. *Beil,* 322 Ill. 434, 442; *People* v. *Fox,* 319 Ill. 606, 619,) or of instructions given by agreement between the State and the defendant, (*People* v. *McGregor,* 26 Ill.2d 239, 244.) or of instructions similar to ones given at his own request. (*People* v. *Rudnicki,* 394 Ill. 351, 360; *People* v. *Calcione,* 369 Ill. 154, 157.) The fifth instruction, which was objected to, has been approved by this court in *People* v. *Durkin,* 330 Ill. 394, 411, and *People* v. *Triolo,* 332 Ill. 410, 413, and we see no useful purpose in further analysis.

What has been said disposes of a remaining contention that the court erred in giving an instruction dealing with the weight to be accorded the coroner's protocol which had been introduced into evidence. This instruction was given at defendant's request, thus he has no standing to complain.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*