THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSE MIRELES, Defendant-Appellant.

First District (4th Division)   No. 77-263

Opinion filed November 29, 1979.

Ralph Ruebner, of State Appellate Defender's Office, of Chicago, for appellant.

Robert Agostinelli and Michael Filipovic, both of State Appellate Defender's Office, of Ottawa, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Rimas F. Cernius, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

This is an appeal by Jose Mireles, the defendant, from his conviction for the murder of Marsha Keshick. Following his conviction by a jury the defendant was sentenced to 15 to 30 years in the Illinois State Penitentiary. On appeal he contends:

(1) the trial court erred in failing to *sua sponte* order a fitness hearing;

(2) defendant was denied effective assistance of counsel when his trial attorney failed to request a fitness hearing;

(3) incriminating statements made by the defendant should have been suppressed as involuntary because of defendant's mental condition when he made them;

(4) the trial court erred in excluding as hearsay testimony concerning defendant's irrational conduct and delusional thinking;

(5) defendant was denied due process when, in response to a defense request for discovery of a memorandum prepared by an assistant state's attorney, the trial court excised certain portions as a non-discoverable work product;

(6) the trial court erred in permitting hearsay testimony showing the intent or state of mind of the deceased;

(7) the trial court erred in permitting the State to use improper impeachment testimony as substantive evidence of defendant's sanity;

(8) the trial court abused its discretion when it permitted photographs of the deceased to be displayed to the jury;

(9) the trial court abused its discretion when it permitted a prejudicial display of electrical wires used to strangle the deceased, and when it permitted these wires to go to the jury;

(10) the jury was erroneously instructed that defendant had given a confession;

(11) the prosecution failed to establish defendant's sanity beyond a reasonable doubt;

(12) defendant's sentence was excessive.

We affirm the judgment and sentence of the trial court.

Defendant's contentions necessitate a summary of pretrial procedures as well as the evidence adduced at trial. Prior to trial, on April 11, 1975, at the request of the assistant public defender who then represented the defendant, Judge Maurice Pompey referred defendant to the Psychiatric Institute of the circuit court of Cook County for an examination concerning his fitness to stand trial. On April 22, 1975, Dr. Langner examined the defendant and found that he was not competent to stand trial.

On August 26, 1975, defendant was represented by private counsel before Judge Mackoff, who presided over all subsequent trial proceedings. Counsel informed the court that a defense of insanity was contemplated and requested a copy of the prior fitness report. The report could not be located at that time. Defense counsel told the court he did not wish to order another such examination, stating he had no basis for such a request. He also stated he had had "no problem with co-operation" with his client. However, when the court was informed by counsel that defendant had a "considerable history" of mental illness or emotional problems, it ordered a fitness examination. Defense counsel then joined in a request for such an examination, but asked that it be extended to the question of sanity as well. He again stated that he had no reason to question the fitness of the defendant.

On October 6, 1975, the court received the report of Dr. Robert Reifman, assistant director of the Psychiatric Institute. It was his opinion, based on an examination he conducted October 3, 1975, that the defendant was not mentally fit to stand trial. He had no opinion concerning defendant's sanity at the time of the offense. Defense counsel then obtained court permission for a private psychiatrist, Dr. Ilse Judas, to examine the defendant as to his fitness to stand trial and his sanity at the time of the offense. The court was also advised that the first evaluation of the defendant had indicated he was not competent to stand trial.

On October 31, 1975, at defense counsel's request, a competency hearing was set for November 20. However, on November 11 defense counsel informed the court that he believed that defendant was not unfit. This was on the basis of his own experience with the defendant as well as the report of Dr. Judas, which he had received but did not yet have available for the court. The court ruled that because of the earlier finding of Dr. Reifman it would schedule a fitness hearing on its own motion.

On December 23, 1975, defense counsel presented to the court the

report of Dr. Judas. In that report Dr. Judas, who examined defendant on November 12, concluded that defendant was fit to stand trial:

"At this point his thought processes are not sufficiently interfered with nor is his affect so far withdrawn that he cannot understand or cooperate in a trial. It seemed to me this was adequately demonstrated by how he was able to deal with me in the interview.

Specifically, he was able to tell me why I was here to examine him according to what I knew his lawyers had told him. In addition, he held up without disintegration to extensive investigation on my part into his personal history, his offense, and the nature and the functions of his lawyers, social worker, and his fitness hearing and trial.

I see no good purpose in continuing to postpone his trial. As a matter of fact there may be adverse consequences as he sits out his guilt and uncertainties. Under the circumstances of his present confinement, he is in as good shape as he is apt to be."

Defense counsel again opposed holding a fitness hearing, basing this opposition on the report and on his experience with the defendant. However the matter was continued to January 21, 1976. On that date the court received the report of Dr. Reifman, who had examined the defendant a second time on January 16, 1976. He concluded that defendant was fit to stand trial "with medication." Upon inquiry by the court one of defendant's attorneys stated that to the best of her knowledge defendant was receiving medication. She also advised the court it was in the best interest of the defendant to have the trial as soon as possible. The court stated that based on the report of Dr. Judas and the revised opinion of Dr. Reifman indicating defendant's fitness for trial, no competency hearing was required.

Prior to trial defendant moved to suppress statements made by him following his arrest on the ground, *inter alia*, that he did not have sufficient mental capacity or control to understand the *Miranda* warnings given him or to knowingly and voluntarily waive the rights communicated by those warnings.

The following facts were adduced at the hearing on defendant's motion to suppress his statements. At about 6:45 p.m. on March 30, 1975, Officers Dale Whitmer and William Solke were sitting in a police car at 2648 West Haddon in Chicago when the defendant approached with his hands out in front of him. In response to their inquiry he identified himself and they arrested him. Defendant was upset and was sobbing at the time. Whitmer read him his *Miranda* rights and defendant said he understood them. He was then transported to the 13th District police station.

At the station Solke again advised defendant of his rights and

defendant indicated that he understood them. He was sobbing as Solke spoke to him. Solke asked if he wanted coffee or cigarettes or whether he could do anything for him. Defendant responded, "If I asked you to kill me, would you?" In response to Solke's questions defendant gave his date of birth, social security number, and address.

At about 8 p.m. defendant was driven to the office of Area 4 Homicide. In the car defendant asked if there was still a death penalty in Illinois. He was told no and when asked why this concerned him he responded that he had taken a life. At Area 4 Officer Ben Wieclawek advised defendant for a third time of his rights and defendant again indicated that he understood them. Defendant then gave a statement, lasting about 30 minutes. During the interview he was emotional, crying and sobbing.

At about 9 p.m. Officer Thomas O'Connor spoke with the defendant. He informed him of his rights and defendant said he understood them. In the presence of members of defendant's family, whose presence was requested by the defendant, O'Connor questioned defendant about the killing and he gave a second statement. He cried during part of the questioning, but O'Connor described him as very responsive to the questions posed.

Assistant State's Attorney Arthur Stefans met with the defendant about 9:30 p.m. He identified himself and advised defendant of his rights. Defendant said he understood those rights and wished to make a statement concerning the incident. Defendant then related what had occurred in a narrative form. On occasion Stefans would interrupt with specific questions and defendant would respond to them. Stefans described defendant as calm and unemotional during the session; he never changed his expression and spoke in a monotone. After the statement was given Stefans asked defendant if he wished to repeat it to a court reporter. Defendant asked to speak with his family, and after doing so he declined to repeat the statement to a court reporter.

Dr. Baker Howell, the chief psychiatrist at Cermak Memorial Hospital, was the sole witness testifying for the defendant at the hearing. He observed the defendant every day from April 2, 1975, to April 10, 1975. His diagnosis was that defendant was suffering from schizophrenic reaction, paranoid type. Dr. Howell explained that this was a mental illness and a form of psychosis. Among its characteristics which he observed in the defendant was a distortion of thinking. Defendant was partially out of contact with reality. He did know where he was, who he was, and was able to give factual information such as his age, but he also claimed to have communicated with God. God had told him that he must die because of what he had done. Defendant also exhibited a bland affect, or observable feeling. He spoke like a machine, with no feeling

involved; no sadness, joy, anger or fear. Dr. Howell noted, however, that this condition might change at any time. A third characteristic of the illness observed by Dr. Howell was suggestibility. He explained that one with this illness would appear docile, would answer all questions and would do what he was told, all out of a desire to avoid interaction with others. The examples the doctor saw in the defendant were that he did not object to his condition of being strapped down in a bed and was not concerned about where he was. Dr. Howell stated that this illness typically does not affect memory so that the person could respond to questions about past activities and relate facts from memory. Thus, the defendant responded in every respect appropriately to questions asked of him by the doctor.

Dr. Howell's opinion was that defendant's condition constituted a severe illness. He could not say how long defendant had been ill, but believed the condition existed prior to April 2 when he first saw the defendant. This opinion was based on the defendant having told him that at some prior time he had entered into a suicide pact with his girlfriend so they would be together forever.

On cross-examination the doctor conceded that defendant had been coherent and had directed his answers to the questions asked. Defendant told him he had strangled his girlfriend and deserved to die for that. The doctor said it would not be a distortion of thinking for one to believe he should be punished for committing a crime, or to feel badly about the act. Nor would it be a distortion of feeling to express sadness and cry over the loss of a loved one. On redirect examination the doctor maintained that coherence and relevance of responses to questions would be consistent with a diagnosis of schizophrenia. He also testified that sadness could also be consistent as it might be caused by depression, often associated with the illness.

At trial Leon Mattigosh, a counselor at Central YMCA Community College, testified that he first met Marsha Keshick in December 1974. Between that time and March 1975 he saw her many times in his capacity as a counselor. On Tuesday of the week prior to her death Marsha told him during a meeting in his office that she liked him. This testimony was elicited over defense objection. Later that same week Mattigosh attended a dinner party hosted by Lynn Dennis. Marsha was there and he sat and talked with her. Later defendant arrived but did not sit with them. He looked upset when he arrived and at one point that evening he yelled at Marsha about her wanting to come to the party and see Mattigosh. On March 30, 1975, at about 1 or 1:30 p.m., Marsha telephoned Mattigosh and they had a 10-minute conversation which abruptly ended when the phone line went dead.

Lynn Dennis testified that she was Marsha's classmate and had

known her for nine to 10 months before her death. Dennis had known the defendant for about three years. She saw both of them on either Wednesday or Thursday evening before Marsha's death when she (Dennis) hosted a dinner party. That evening defendant told her he loved Marsha but feared they might break up. Over defense objection Dennis also testified that about two weeks before the dinner Marsha told her she and defendant were having problems, she was thinking of leaving him, and was interested in Mattigosh. Marsha also told her she had mentioned these matters to the defendant.

Over defense objection Officer Ben Wieclawek related the statement defendant gave him upon questioning at about 8:15 p.m. on March 30, 1975. Defendant stated he went to the apartment at 1340 North Washtenaw. At the front door he heard Marsha talking on the phone. When he heard her mention she was talking with another man he became angry and kicked the door in. Marsha hung up the phone and began writing a letter at a table. Defendant stood there for a few minutes and then went to a neighbor and borrowed a hammer and some nails to repair the door. After repairing it he returned the tools and came back to the apartment where Marsha was still writing a letter. Defendant told her that if he could not have her nobody else would. He strangled her with an electrical cord used in the kitchen and then placed her body on a mattress in the front room. He sat beside her for a few minutes, then tore the telephone cord from the socket and left. He borrowed a dollar from a neighbor in the building and went to a restaurant where he telephoned his mother and told her he had killed Marsha and planned to kill himself. From there he went to a CTA subway station and unsuccessfully attempted suicide by standing on the third rail. Defendant then went to the area of his mother's house where he was arrested.

Officer Wieclawek also testified that he himself entered that apartment about 6:15 p.m. on March 30. He identified an unfinished letter which he found on the kitchen table. It contained, *inter alia*, the following statements: "I am not going to marry Graywolf," and "I'll be moving and hopefully I'll be out of this house by the time you receive [*sic*] this letter."

Assistant State's Attorney Arthur Stefans related a second statement given by the defendant. Defendant told him he went to the apartment about 3 p.m. He heard Marsha talking on the telephone inside and when there was no response to his knocking he kicked it open. Marsha hung up the phone and in a brief conversation told him she had broken her vows to him and was seeing another man. After borrowing tools and repairing the door defendant approached Marsha as she wrote a letter and told her he was going to have to kill her. He then strangled her with the cord, which he left behind along with the letter when he left the apartment.

Lawrence Horton testified that on March 30 he was staying in an

apartment directly opposite that of the defendant. That afternoon[1] he heard a kicking sound, looked out his door, and saw defendant standing by the door to defendant's apartment. One of the top panels of that door was out and defendant explained that he was angry and had kicked the door down. He borrowed a hammer from Horton, returning it in 15 minutes.

Robert Weir, an ambulance driver for the Chicago Fire Department, testified that on March 30 at about 5:30 p.m. he received an assignment to go to 1340 North Washtenaw. He entered a third-floor apartment there and saw a young woman on the front room floor. His partner checked her and found no signs of life. She was lying near a mattress on the floor and there was an electrical cord nearby. He saw broken glass on the kitchen floor, which was next to the living room. At trial Weir identified State photographic exhibits as depicting the victim and the premises as he found them.

It was stipulated that Dr. P. K. Culala, a pathologist employed by the Cook County Coroner, would testify that he performed an autopsy on Marsha Keshick's body and determined the cause of death to be strangulation.

William Scanlon, a Chicago police officer assigned to the crime laboratory, testified that when he arrived at the apartment about 7 p.m. he noticed two pieces of electrical cord near the body. Over defense objection he identified two State exhibits as those items and demonstrated how they were tied together when he found them. Defendant's motion for a mistrial because of this demonstration was denied.

Defendant's first witness, Ted Minnick, testified that at about 3 p.m. on the day of Marsha's death defendant borrowed a saw from him, explaining that he needed it to repair doors damaged in a breakin. Defendant returned the saw about one hour later.

Officer William Solke testified about the circumstances of defendant's arrest, including his emotional condition. Defendant at one point said he used the name Johnny Graywolf. Solke again related that defendant asked if he would kill him because he had killed Marsha. On cross-examination Solke expressed his opinion that based on his observations of the defendant on that day he was able to conform his conduct to the requirements of law and to appreciate the criminality of his conduct.

Defendant's sister, Maria Gallegos, testified extensively about his early history. She recalled that defendant did poorly in school and most of

---

[1] On direct examination Horton stated the time as about 1:45 or 2 p.m. On cross-examination he stated first that it could have been as late as 3 p.m. and then indicated that he only remembered that it was in the afternoon.

his friends were much younger than he was. After his second year in high school he enlisted in the Navy for a two-year term but left after about 14 months. He returned to Chicago and lived with his mother for about six months. Maria only saw him once or twice for the next few years. Late in 1973 she saw him with bandages on his forearms. The trial court first sustained State objections to any testimony concerning defendant's explanation of these bandages. But after defense counsel made an offer of proof concerning that explanation, and represented to the court that he would establish that this explanation was not true but rather was an example of delusional thinking, the testimony was permitted. Maria testified that defendant told her he had been living with an Indian woman on an Indian reservation. She bore his child but then mother and child died of tuberculosis. The court did not permit Maria to testify that defendant said he cut his arms because of these deaths. Defense counsel in his offer of proof did not claim that this portion of the account was untrue.

Maria further testified that in November 1974 defendant and Marsha Keshick moved into her apartment building at 1340 North Washtenaw. She saw them every day and noted that although they occasionally got mad at each other defendant never threatened or yelled at Marsha. However, at a New Year's Eve party in 1975, Maria observed defendant trying to talk to Marsha, who ignored him. Defendant seemed depressed at the time.

During the period that defendant lived in Maria's building he seemed very interested in religion and cults. He talked a lot about life after death, psychic matters, fasting, and wanting to have seances. A defense question asking with whom he discussed these matters was successfully objected to by the State.

According to Maria defendant occasionally smoked marijuana at her home, sometimes doing so early in the morning or late at night. Three days before Marsha's death he promised not to use any drugs and began a fast to "cleanse" himself. Maria observed generally that he was "really into" religion and fasting.

Maria also related some of the events surrounding Marsha's death. Defendant arrived alone at their mother's home between 2 and 2:30 p.m. on March 30, 1975. The family was preparing for an Easter Sunday dinner. He explained that Marsha was still getting dressed and his mother told him to go get her. Later, after a phone call received by defendant's mother, Maria and another brother ran to defendant's apartment and discovered Marsha's body on a mattress on the living room floor. Her arms were extended from her body at a 90-degree angle with the palms up and she was lying on her back. The phone was pulled out of the living room wall and there was an unfinished letter on the kitchen table.

Later that evening Maria and other family members saw defendant at the police station. When he spoke to them he cried intermittently and did not speak in complete sentences. Maria subsequently saw him on visiting day at Cermak Memorial Hospital. She was not permitted to testify to what defendant told her on those occasions about the March 30 incident. Defense counsel made an offer of proof that these conversations would establish contradictions, denials, and omissions in defendant's account of what occurred. Counsel informed the court that "other witnesses" would describe how this related to his mental condition. He also stated that the witness would testify to information concerning the occurrence in the apartment that she learned independently. He wished to bring this in because the evidence would show that only after defendant was advised by others what they observed did he begin to formulate what he believed happened. Counsel indicated this would relate to expert medical testimony concerning defendant's condition at the time of the offense. Maria was also prevented from relating what Ted Minnick told her a few days after the incident. No offer of proof was made specifically concerning this proposed testimony.

On cross-examination Maria stated she had often talked to Marsha, sometimes about defendant's relationship with Marsha. Towards the end of March 1975, Marsha told her she was not sure if they (defendant and Marsha) would be together all of the time.

Defendant's mother, Geraldine Perez, also related some of the facts surrounding the occurrence as well as many details of defendant's life. On March 30, 1975, she got a call from defendant about 5 p.m. He was crying and breathing heavily. He told her Marsha was dead and he was going to kill himself. It was after this call that Maria and her brother ran to defendant's apartment. One hour later Mrs. Perez saw defendant approaching her house. His face was flushed, he was crying and was breathing heavily. At that time he was arrested. When she saw him later that day at the police station he was sobbing and shaking. She recalled that he said he wanted to die. A State objection was sustained to a question about a conversation she and defendant had several weeks later at Cermak Hospital. No offer of proof was made concerning this testimony.

Mrs. Perez related that she was 18 years old when defendant was born. He was her third child in less than three years and she did not want him. When he was four years old he was placed in Maryville Academy in Des Plaines, Illinois, by the juvenile court because she was determined to be an unfit mother. He was returned to her at age 9. Defendant did not participate in school sports or activities and his friends were half his age. After his discharge from the Navy he lived with his mother for six to seven months and then left. She would see him every seven or eight

months and otherwise did not know where he was. She was told essentially the same story related by Maria when she saw his bandaged arms in 1973. The only differences were that he said he married the Indian girl, named Marsha, and her death was from heartbreak. Mrs. Perez was also not permitted to testify that defendant said he attempted suicide after this.

Defendant introduced Mrs. Perez to Marsha Keshick in the spring of 1974 and after that she saw them both frequently. He had been brought up as a Roman Catholic and participated in many church activities during his childhood and after he left the Navy. But in the period after Mrs. Perez was introduced to Marsha defendant became involved in the occult and would go into trances. (Mrs. Perez also stated that he "made contact" but this statement was stricken after the State objected to the conclusion.) Mrs. Perez recalled that once defendant concentrated on a photograph in an attempt to make that person call him. He would also go into periods of fasting lasting several weeks. (Again a statement by Mrs. Perez that defendant would talk "wildly" about going into the mountains was stricken on the State's motion.) He and Marsha read and carried around a Bible or prayer book "belonging to another religion." A State objection was sustained to a question concerning whether defendant discussed religious matters with his mother. And her statement that he told her "stories of fantasy" was also stricken. Defense counsel's offer of proof as to the religious conversations was that defendant told his mother he was deeply into the occult and had conversations with God. On the question of stories of fantasy counsel represented to the court that at "certain times" defendant would tell his mother: he had been in trances and heard voices; a friend in the Navy drowned (a story counsel said Mrs. Perez later determined to be false); stories of "big accidents" occurring to him like someone trying to rob him but then he would say the story was not true.

Mrs. Perez recalled that after defendant left the Navy he used the name John Graywolf as well as his real name. The last time she saw Marsha and him together was 3 a.m. Easter morning at her home where they watched two religious movies on television. They were very affectionate with each other at that time.

Testifying in his own behalf, defendant answered detailed questions concerning his personal history including schools attended and past residential addresses. His discharge from the Navy was for bringing fireworks aboard an ammunition and fuel ship. When he returned home he worked at a bicycle factory for a while and took karate lessons. In 1971 he had been using a lot of drugs and so he enrolled in a drug abuse program. He left in 1972 and worked for a time at the American Indian Center in Chicago.

At this time he was using the name John Graywolf. In the summer of 1973 he spent several weeks with Indian friends on a trip west which included stays at an American Indian Convention and an Indian reservation. He told his friends, who knew him as Johnny Graywolf, that he was Indian. During this period he did not live with any Indian woman. No Indian woman ever bore his child nor did he ever know one who died of tuberculosis. However, on two occasions after women with whom he was involved indicated they were going to leave him, he "cut" himself after hearing voices telling him to do so. At this time he was using drugs, including marijuana and L.S.D. After his second suicide attempt, when he was in the psychiatric ward of a hospital, he told a psychiatrist that he had lived on a reservation and his name was Johnny Graywolf. Defendant testified that though this was not true he believed it at the time. It was after leaving this hospital that defendant explained his bandaged arms to his family with the story of the death of his Indian wife and their child. At trial he stated that he only remembered telling this to them after he heard court testimony about his doing so. Again he indicated that he believed the story to be true when he told it although it was not true.

Defendant met Marsha Keshick in April 1974 and they began living together. She called him Johnny Graywolf but knew his real name. Defendant was still taking drugs at the time. Marsha was a Mormon and defendant began to read her Mormon bible.

Around December of 1974 Marsha indicated she was going to leave the defendant, but he did not believe this. She had left and come back once before. In March 1975 he arrived at Lynn Dennis' party and saw Marsha sitting with Leon Mattigosh. At the party he talked to Dennis about Marsha liking Mattigosh and asked her what he should do. After the party he went home with Marsha. When he asked her whether she loved Mattigosh or him, she said she loved him. However, some time after the party she told defendant she had started liking Mattigosh. He became depressed and cut himself when voices told him to do so. During this period he was fasting because he had read in the Bible about God talking to people who did so. God did not talk to him, however. Defendant admitted at trial that he was jealous of Mattigosh and was depressed about Marsha beginning to like Mattigosh. At one point he told Lynn Dennis that Marsha was going to leave him.

The night before Marsha's death defendant watched "The Ten Commandments" and "Barrabas" with her on television. He stated that he recalled doing this only because he heard his mother testify about it. He went home after that and slept until about 2 p.m. He then returned to his mother's house. While there he made a phone call. He only remembered making the call because his mother had testified that he did so. He returned home again and as he walked up to his apartment he thought he

heard Marsha saying on the telephone, "Leon, I want to be with you." Although he denied being angry, he kicked in a door panel in order to go inside. Marsha hung up the phone and defendant then repaired the door. When he had finished Marsha was sitting at the kitchen table writing a letter. He sat in a chair and started shaking. He went in the kitchen and strangled Marsha with a cord. Defendant also testified that a voice told him to take Marsha's life, so he did. Defendant then related the details about taking a bus to a restaurant, calling his mother to tell her he had killed Marsha, attempting suicide on the subway tracks, and finally being arrested near his mother's home. He could not recall what happened at the police station except that he was crying and was not paying attention to what anyone was saying.

Defendant testified that he sometimes heard voices telling him to kill himself and that he heard this several nights before the day of his testimony.

On cross-examination defendant could not recall telling a nurse named Borja at Cermak Hospital that he wanted to kill himself because he knew he was going to stay in jail for 20 to 30 years.

The next defense witness was Dr. Howell. Defendant was his patient from April 2, 1975, until the time of his testimony except for several weeks of vacation. Defendant at first exhibited a bland affect, which Howell explained in lay terms as being emotionless. The first day Howell saw him, defendant said he had strangled his girlfriend when he heard her on the telephone talking to someone else, and he thought she was being unfaithful to him. Defendant also told Howell that God spoke to him and told him he should die for his sins. Howell observed in the defendant a preoccupation with religion and suicide. His diagnosis was that defendant was suffering from a schizophrenic-like reaction, paranoid type. He believed him to be delusional, basing this in part on defendant imagining he heard his girlfriend talking on the phone to someone else. On cross-examination Howell conceded that if defendant had in fact heard this, it could possibly affect the doctor's evaluation.

Dr. Howell stated that he had no way of knowing when the onset of the disease occurred. The disease did not necessarily mean that one could not appreciate the nature and quality of one's actions. Indeed it was his opinion that there was no scientific way to determine whether a person could do this.

Dr. Ilse Judas also presented psychiatric testimony for the defendant. She had examined him eight months after the crime and diagnosed him as having the psychosis called schizophrenia. In response to a lengthy hypothetical question setting forth the facts of the offense as well as the defendant's history as brought out by the defense, Dr. Judas expressed her opinion that the hypothetical person lacked substantial capacity to

appreciate the criminality of his act and could not conform his conduct to the requirements of the law.

In rebuttal Velma Borja, a nurse at Cermak Hospital, testified that on March 31, 1975, she prepared an admitting record for the defendant. She could not recall any conversation with him even after reading that record. However she did testify that the document was prepared in her hand-writing and she had written down what defendant told her. This exhibit was subsequently admitted into evidence over defendant's objection. It has not been included in the record on appeal, but apparently it contained the statement: "the patient stated he is suicidal, he wanted to kill himself because he knows he is going to stay in jail for twenty to thirty years and he doesn't want to be locked up."

Also testifying in rebuttal was Dr. Robert Reifman, assistant director of the Cook County Psychiatric Institute. He examined the defendant six months after Marsha's death and again nine months after that occurrence. On both occasions he diagnosed defendant as schizophrenic. In response to a hypothetical question by the State which included the events immediately surrounding Marsha's death Dr. Reifman gave his opinion that the person in the hypothetical question was not suffering from a mental disease at the time of the killing and had the capacity to appreciate the criminality of his act and to conform his conduct to the requirements of the law. On cross-examination Dr. Reifman stated that if the phone call heard by the person in the hypothetical question had been imaginary, he would be "inclined to feel" that the person was suffering from a mental disease. He indicated that he then would need more information to determine if the person could appreciate the criminality of his acts or conform his conduct to legal requirements; this was true even though these additional hypothetical facts were added: the person watched religious programs with his girlfriend the night before; on Easter Sunday he heard voices telling him to kill her; he then killed her and laid her body on a mattress with her arms stretched out.

## I.

■■ We find no merit in defendant's initial contention that he was denied a fair trial and due process of law when the trial court failed to *sua sponte* order a fitness hearing prior to trial. The relevant statute provides in pertinent part:

"(a) For the purposes of this Section a defendant is unfit to stand trial or be sentenced if, because of a mental or physical condition, he is unable:

(1) to understand the nature and purpose of the proceedings against him; or ·

(2) to assist in his defense.

(b) The question of the defendant's fitness may be raised before trial or during trial. The question of the defendant's fitness to be sentenced may be raised after judgment but before sentence. In either case the question of fitness may be raised by the State, the defendant or the court.

(c) When a bona fide doubt of the defendant's fitness to stand trial or be sentenced is raised, the court shall order that a determination of that question be made before further proceedings." (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1.)

It is for the trial court, in the sound exercise of its discretion, to determine whether a bona fide doubt concerning a defendant's fitness has been raised. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Davis* (1978), 65 Ill. App. 3d 580, 382 N.E.2d 594.) Only upon a showing of an abuse of that discretion will the trial court's determination be overturned. *People v. Davis.*

■■ Defendant first asserts that the psychiatric reports received by the court were in themselves sufficient to raise a bona fide doubt of fitness, citing *Drope v. Missouri* (1975), 420 U. S. 162, 43 L. Ed. 2d 103, 95 S. Ct. 896, and *People v. Chambers* (1976), 36 Ill. App. 3d 838, 345 N.E.2d 119. In *Drope* defense counsel informed the court prior to trial that defendant was not of sound mind and requested further psychiatric examination. An earlier psychiatric report submitted to the court indicated the defendant had a difficult time participating in his examination. But in addition to these indications it was noted that defendant was absent from part of his trial because of a suicide attempt, so that the trial court was deprived of the opportunity to observe his demeanor. In determining that a fitness hearing should have been held the Supreme Court noted that the suicide attempt suggested a rather substantial degree of mental instability contemporaneous with trial. In *Chambers* in addition to two psychiatric reports recommending defendant's involuntary commitment there was substantial evidence of defendant's instability at trial. The defendant interrupted trial testimony with an admission of guilt and a request for hospitalization but then on direct examination denied his guilt. In reviewing that direct examination this court found a general inability by the defendant to communicate with his lawyer or to narrate the occurrences at issue. In the cause at bar two initial psychiatric evaluations resulted in determinations that the defendant was unfit to stand trial. But these reports were followed several months later by two determinations of fitness when defendant was examined by one of the psychiatrists who first found him unfit and by a defense psychiatrist. At no time did defense counsel indicate that he believed defendant to be unfit to stand trial; indeed, he affirmatively informed the court on several occasions prior to trial that he believed him to be fit. Thus, this case more closely resembles

*People v. Nettles* (1975), 32 Ill. App. 3d 1082, 338 N.E.2d 199, in which an initial psychiatric finding of incompetency was followed several months later by two reports finding the defendant fit. Noting that the court had an opportunity to observe the behavior and demeanor of the defendant at trial, this court found no abuse of discretion in the failure of the trial court to order a fitness hearing because of an earlier report indicating unfitness.

Defendant also asserts that there was sufficient evidence at trial of his incompetence to raise a bona fide doubt on that issue. But the isolated instances cited, such as an inability to precisely date certain events, or the failure to recall the names of all the psychiatrists he had seen, are taken from a totality of testimony at trial which was clear and coherent and detailed. Certainly there was nothing to compare with behavior of the defendant in the case cited by defendant, *People v. Burson* (1957), 11 Ill. 2d 360, 143 N.E.2d 239. In *Burson* the defendant attempted to represent himself, claiming to have the aid of spiritual counsel. On voir dire he asked prospective jurors about their religious beliefs, called his attorney to testify and subjected him to abusive questioning, and in final argument discussed his religious beliefs on the need for salvation and his theories of evolution.

In *People v. McClain* (1967), 37 Ill. 2d 173, 226 N.E.2d 21, cited by defendant, a conviction was reversed because the court felt that had the trial court known of defendant's history of mental illness and suicide attempts it might well have found a bona fide doubt of his fitness such as to require a hearing on the issue. Here the trial court was fully aware of the defendant's history and in fact ordered a psychiatric examination because of that history. On this record we find no abuse of discretion in the failure of the trial court to additionally order a fitness hearing.

## II.

Because of the conclusion we have reached on the fitness issue, it is clear that no basis remains for defendant's claim that he was denied effective assistance of counsel by the failure of his counsel to request a fitness hearing. *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.

## III.

As we have noted, defendant's motion to suppress incriminating statements made by him as involuntary was denied following an evidentiary hearing. On appeal he contends that determination was erroneous, basing this contention on the evidence then adduced and on evidence adduced at trial.

The ultimate test of admissibility of such statements is voluntariness, to be determined upon review of the totality of the circumstances.

(*Culombe v. Connecticut* (1961), 367 U.S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860; *People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827.) The trial court's determination of the issue will not be disturbed unless it was contrary to the manifest weight of the evidence. *People v. Hicks* (1966), 35 Ill. 2d 390, 220 N.E.2d 461, *cert. denied* (1967), 386 U.S. 986, 18 L. Ed. 2d 236, 87 S. Ct. 1295.

■ It is undisputed that defendant was fully and repeatedly advised of his constitutional rights prior to being questioned. What defendant contends is that because of his mental condition at the time he was questioned his statements were not voluntarily made. Defendant relies primarily on *Blackburn v. Alabama* (1960), 361 U.S. 199, 4 L. Ed. 2d 242, 80 S. Ct. 274, in which the Supreme Court reversed a conviction based on a confession which overwhelming evidence indicated was made while the defendant was insane. Four years before commission of the offense, the defendant in *Blackburn* was discharged from the army as permanently disabled by psychosis. He was institutionalized for about four years and was on an unauthorized absence from the mental hospital at the time he committed the offense. He had been diagnosed as having a schizophrenic reaction, paranoid type and also was found incompetent. Some time after he made his confession the sheriff observed signs of insanity. Defendant was then examined under Alabama procedure by a lunacy commission, which unanimously declared him insane. He was committed but escaped and was charged with another offense, again declared insane, and returned to the hospital where he remained for four years until he was found competent to stand trial. At the hearing on admissibility of his confession the depositions of the three doctors on the lunacy commission were presented. Two of them stated their belief that defendant was insane and incompetent at the time of the confession. Although the third doctor disagreed, the Supreme Court found his statement to be so internally contradictory as to raise no genuine conflict on the matter. The court also noted that defendant was interrogated for eight to nine hours in a tiny room with as many as three officers present and without the presence of legal counsel or any friends or relatives.

The record in this cause bears no resemblance to that in *Blackburn*. Defendant had never been found to be insane or incompetent prior to the time of his statements. Although he testified that he had been in hospital psychiatric wards on earlier occasions, these were apparently brief stays on a voluntary basis following suicide attempts. At the hearing Dr. Howell stated his belief that defendant's schizophrenic condition, diagnosed several days after defendant made his statements, related back for some time. But this opinion was based solely on defendant's statement to the doctor that he and his girlfriend had entered into a suicide pact so that they would be together forever. The trial court was not bound to

accept this theory, and indeed, in denying defendant's motion, it expressly found that defendant had failed to establish that the condition observed by the doctor existed at the time the statements were made. Defendant also notes the testimony of the assistant state's attorney that defendant spoke in a monotone and showed no emotion when questioned by him, citing this as evidence of the "flat affect" that Dr. Howell testified was a characteristic of defendant's mental condition. But this was also explainable by the fact that defendant had already repeated his statement several times to other investigators, so that he might well have been drained of the emotion which testimony indicated he displayed earlier. The testimony at the hearing established that defendant surrendered himself to authorities, expressed remorse, and gave a factual narrative account of what had occurred. After consultation with his family he chose not to give a statement in the presence of a court reporter, thus displaying the capacity to exercise the rights explained to him. Without exhaustively discussing every factor cited by defendant in support of his contention, it suffices to note that upon review of the totality of the evidence we do not find the trial court's determination of voluntariness to have been contrary to the manifest weight of the evidence. Accordingly, we will not disturb that judgment.

## IV.

Defendant cites a number of instances at trial in which his mother and sister were prevented by successful State objections from testifying to out-of-court statements made by him. He urges that these statements were erroneously barred as hearsay when in fact they were offered only as evidence of defendant's mental state and thus not subject to the hearsay rule. Exclusion of this evidence, defendant contends, prejudiced him in the presentation of his insanity defense.

■■■ As defendant correctly notes, out-of-court statements made by a defendant asserting an insanity defense are admissible when they are introduced not for the truth of the matter asserted but as evidence of the defendant's state of mind. (*People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121, *cert. denied* (1977), 434 U.S. 988, 54 L. Ed. 2d 484, 98 S. Ct. 620.) But upon a review of the record we find that the trial court, contrary to defendant's contention, was aware of this rule and admitted evidence on that basis when defense counsel properly presented it. In *Garlick* the trial court apparently barred all testimony by the defendant's mother and sister concerning statements he made in the month prior to the murder for which he was convicted. The reviewing court found that these statements were offered as examples of defendant's irrational behavior, in support of his insanity defense, and not to establish the truth of those statements. It is noteworthy that in *Garlick* defense counsel had

elicited the testimony of these witnesses *in camera* as an offer of proof, so that the trial court and the reviewing court knew precisely what the testimony would be. Such detailed and specific offers of proof are required where it is not clear what the witness will say or what the basis for the evidence will be. (*People v. Robinson* (1977), 56 Ill. App. 3d 832, 371 N.E.2d 1170.) In this cause although defendant did present offers of proof concerning much of this testimony, many of those offers did not clearly indicate what the testimony would be or what its purpose was. Defense counsel did clearly indicate to the trial court that he wished to elicit from defendant's sister and mother their recollection of the tale he told them about having an Indian wife and a baby by her and their subsequent deaths. Counsel also stated that a subsequent witness would establish that this tale was untrue and thus was an example of defendant's delusional thinking. On this basis the trial court did permit the testimony, although the additional fact that defendant cut his wrists was barred because there was no representation that this was untrue. But subsequent offers of proof as to other statements of the defendant were not so clear. For example defendant complains that his counsel was barred from eliciting the testimony of his mother that he told her "stories of fantasy." In his offer of proof defense counsel stated:

"* * * I frankly don't know which incident she will, which incident pertains to the periods of time as they have been isolated here in court, but I believe that she will indicate that, first of all, that certain times Jose would tell her that he had been in a trance and heard voices and, I believe, your Honor, that that is indicative of delusional thinking.

\* \* \*

I believe that she also will say that he told her at certain times that, that, that he told her that, or rather, a rather incredible story about a friend of his having died and, drowning, was in the Navy, and that she later determined that that was not so.

\* \* \*

That she would tell about him, things like what he called big accidents, she would call big accidents or catastrophic events of a major nature either to himself or such things as that someone tried to stick him up and done [*sic*] harm to him, and that when confronted, that he would then admit that there was no truth to that."

This was not an offer of proof calculated to inform the trial court with any particularity about what was sought to be elicited. Similarly, when defense counsel was prevented from eliciting from defendant's sister the substance of conversations he had with her at Cermak Hospital after his arrest, a very general offer of proof was made in which counsel alleged

that the witness would testify that defendant first gave her little factual information about what had occurred but then began to tell her more. Counsel further stated:

"Now, of course, this witness cannot testify to the mental processes, but I expect that other witnesses who will be heard will be able to testify and they will describe what—how this related to his mental condition and any mental disease he may have had. Now, there will be, I believe, contradictions, in fact as to what he said happened, sometimes denials, sometimes omissions, and furthermore this witness will indicate that she advised the defendant by questions or in other ways of certain things which she independently learned about what happened in the apartment and of course she has testified to what she learned in the apartment and this will be important, your Honor, because I believe all of the evidence will show that it was after the defendant was advised through people he talked to of what they observed that he then began to formulate, to express what he believed happened. And again, your Honor, I think that this is going to be demonstrative of his state of mind, and I think that the medical expert who testified [sic] will attempt to explain what this means, and it will have a bearing on their decision or their opinion as to the defendant's condition at the time of the offense."

Although counsel now urges that this testimony would have been related to symptoms of defendant's mental condition, such as suggestibility, the offer of proof failed to adequately particularize the purpose or substance of this evidence. We find no error in the failure of the trial court to permit such testimony on the basis of such vague offers of proof. See *People v. Porter* (1975), 29 Ill. App. 3d 456, 330 N.E.2d 599.

■■ Even were we to find that the trial court erred in barring the evidence cited by defendant, we would find no prejudice resulting in this record. Defense counsel was permitted a wide-ranging inquiry into defendant's personal history and past behavior. This case is thus distinguishable from *People v. Haun* (1966), 71 Ill. App. 2d 262, 217 N.E.2d 470, cited by defendant, in which defendant's insanity defense was found to be prejudiced by a trial court ruling restricting the evidence to events occurring the day of the murder. Defense counsel in this cause, because of the latitude allowed by the court, was able to elicit ample testimony concerning defendant's religious preoccupations, his interest in the occult, periods of fasting, hearing voices, and alleged examples of his suggestibility. This testimony provided the foundation for a lengthy hypothetical question asked of Dr. Judas to which she responded with her opinion of the defendant's insanity at the time of the offense. Because defendant was fully able to present his insanity defense to the jury we would

find no prejudice arising from the exclusion of the evidence cited by defendant, even assuming such exclusion was erroneous. See *People v. Dyer* (1977), 47 Ill. App. 3d 63, 361 N.E.2d 770; *People v. Pecora* (1969), 107 Ill. App. 2d 283, 246 N.E.2d 865, *cert. denied* (1970), 397 U.S. 1028, 25 L. Ed. 2d 538, 90 S. Ct. 1274.

## V.

During examination of Assistant State's Attorney Stefans at the hearing on defendant's motion to suppress, he revealed that he had prepared a memorandum summarizing the statement defendant gave him. Defense counsel requested a copy of this document, but the State objected on the ground that it was a nondiscoverable work product. The State also informed the court that the memorandum had been reproduced "almost word for word" in their amended answer to discovery. After an *in camera* examination of the memorandum the court determined that the portion containing defendant's statement should be turned over to defendant. However he ordered excision of the remaining portion which he deemed to be a work product. Defendant contends that this violated his right to discovery and also constituted a violation of the *Brady* rule requiring disclosure of evidence favorable to the accused. *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

The excised portion contains, *inter alia,* the following information:
"Stefans was advised that Lawrence Horton was at Betty Caradina's apartment on March 30, 1975, at approximately 3:00 p.m. when they both saw and heard defendant kicking at the victim's door;
Stefans was advised that two thirteen-year old boys, Ricardo Ortez and Angel Matos were in Norman Jiminez's apartment at approximately 3:30 p.m. on March 30, 1975 when defendant came in to borrow a dollar;
The police estimated that Marsha had been dead for approximately three hours when they found her at 6 p.m. that day."

It is clear that these were not the substantially verbatim statements of witnesses to which the defendant would have been entitled under Supreme Court Rule 412. (Ill. Rev. Stat. 1975, ch. 110A, par. 412.) Rather, these were in the nature of "thumbnail" summaries which have been held not to be discoverable. *People v. Durso* (1968), 40 Ill. 2d 242, 239 N.E.2d 842, *cert. denied* (1969), 393 U.S. 1111, 21 L. Ed. 2d 807, 89 S. Ct. 923; *In re Forrest* (1973), 12 Ill. App. 3d 250, 298 N.E.2d 197.

Nor do we find any *Brady* violation arising from the trial court's action. The only item which defendant specifically claims would have been favorable to him is the information that Lawrence Horton saw

defendant kicking at Marsha's door at approximately 3 p.m. This would tend to contradict the State's theory that the death occurred earlier when defendant interrupted Marsha's telephone call to Leon Mattigosh at 1:30. Although Horton testified on direct examination that he heard the kicking sound at 1:45 or 2, on cross-examination he conceded that it could have been as late as 3 p.m. and that he only remembered that it was some time in the afternoon. In addition, in the cross-examination of Officer Wieclawek the defense brought out that Horton (transcribed in the record as "Lordon") told him he saw defendant at about 3 p.m. Thus, the substance of this information was brought out at trial. We also note that because defendant has failed to include in the record on appeal the State's amended answer to discovery, there is nothing to contradict the representation of the State at trial that all of this information was contained in that document and turned over to defendant prior to trial.

## VI.

Defendant asserts that he was prejudiced because the trial court erroneously permitted the State to present hearsay evidence of Marsha Keshick's statements about her relationship with him. Specifically, Leon Mattigosh testified that several days before Marsha's death she told him that she liked him. Lynn Dennis testified that two weeks before her death Marsha told her she and the defendant were having problems and she was not sure she would stay with him. And the State was permitted to introduce into evidence a letter, found in the apartment, in which Marsha wrote that she was not going to marry the defendant and expected to leave soon.

As defendant notes, it has long been held in this State that evidence of a murder victim's state of mind was not admissible unless there was a showing of specific knowledge of that state of mind by the defendant. (*Weyrich v. People* (1878), 89 Ill. 90.) In *Weyrich* a woman was convicted for the murder of her husband, based in part on the testimony of witnesses who stated that the husband had told them he knew his wife to be unfaithful to him. The court held that this evidence was inadmissible hearsay because there was no proof that the knowledge of such suspicion was ever communicated to the defendant. What defendant in this cause ignores is that there was ample evidence to support a finding that defendant was aware that Marsha Keshick was interested in Leon Mattigosh and had doubts about their relationship. Defendant himself admitted in his testimony that he was jealous of Mattigosh and that he killed Marsha after he heard her telling Mattigosh on the phone that she wanted to be with him. Lynn Dennis testified that defendant told her several days before Marsha's death that he was afraid they might break

up. Leon Mattigosh testified that on that same evening defendant became angry when he saw Marsha talking with Mattigosh, and he yelled at her about wanting to come to see Mattigosh. Moreover, in defendant's statement to the police he specifically mentioned that Marsha was writing a letter just before he killed her, so that he clearly had the opportunity to read it and the question of whether he did so was for the jury to resolve. In this respect the situation is analogous to that in *Abernathy v. People* (1970), 123 Ill. App. 2d 263, 259 N.E.2d 363. In *Abernathy* the defendant was on trial for murder and the State introduced evidence that the day before the killing the defendant's son was struck by the victim. Defendant denied knowledge of the incident and his wife and son testified that they did not tell him of it. But the trial court noted that the opportunity to be informed of the incident presented a question of fact for the jury as to whether defendant was aware of the incident, so that admission of the testimony was proper. In this cause there was direct evidence that tended to establish that defendant was aware of Marsha's state of mind concerning Mattigosh and him, so that the evidence of which defendant complains was properly admitted. We also note that no prejudice could have resulted from this evidence because of the other testimony we have cited which also tended to establish the same state of mind.

## VII.

Defendant claims prejudicial error in the admission of evidence that he told the admitting nurse at Cermak Hospital the day after the offense that he wanted to kill himself because he knew he was going to stay in jail for 20 to 30 years. Defendant contends that he was improperly impeached concerning this statement and that it was subsequently improperly used as substantive evidence.

■■ Assuming that this statement was properly introduced, it is clear that in fact it was proper substantive evidence tending to rebut defendant's claim of insanity. It served to offer an explanation for the suicidal tendencies diagnosed by defendant's expert testimony; testimony that defendant presented as evidence relating to his sanity at the time of the offense. It also bolstered the State's contention that defendant was able to appreciate the criminality of his conduct. Thus, if the State could elicit this evidence in a proper manner, it was admissible as substantive evidence relating to defendant's mental capacity and conduct. See *People v. Muskgrove* (1976), 44 Ill. App. 3d 381, 358 N.E.2d 336.

■■ In this context it can be seen that when defendant was asked if he made the statement this was an attempt to elicit substantive evidence, or at least was preliminary to the introduction of such evidence. This was not an attempt to establish a foundation for merely impeaching evidence. In its rebuttal of the insanity defense the State examined Nurse Borja, who

had recorded the statement. Because she could not recall that defendant made it, the State was required to establish the foundation for admission of the written record of the statement as a past recollection recorded. It was required to establish that the witness had no independent recollection of the statement, could not recall it even when shown her record of it, but could affirm that she recorded it accurately and at or near the time it was made. (*Smith v. Williams* (1975), 34 Ill. App. 3d 677, 339 N.E.2d 10; *Healy v. City of Chicago* (1969), 109 Ill. App. 2d 6, 248 N.E.2d 679.) Nurse Borja testified that she prepared an admitting record for the defendant on March 31, 1975. She could not recall the conversation she had with him even when shown the record, but she testified that the record was in her handwriting and was true and accurate because she wrote down what defendant told her. Although the statement was phrased in the third person, we do not find that this negates her statement that she did accurately record the defendant's statement as he made it. Accordingly we find that the subsequent admission of the recorded statement was not improper.

Defendant also notes two additional instances in which he asserts that the State improperly used this evidence. On cross-examination of the defendant he was asked if he wanted to "do" 20 to 30 years of his life, but a defense objection to the question was sustained. And on cross-examination of Dr. Judas the State asked if the stress of facing 20 to 30 years in the penitentiary would cause a person to lapse into a psychotic state. There was an evidentiary basis for these questions independent of the statement to which defendant objects. The very nature of the crime which defendant was alleged to have committed clearly carried with it the possibility of extended incarceration. Thus although the time frame used in the questions may well have been suggested by the statement which the State possessed, we do not find that they constituted an improper use of that evidence. Nor would we find any prejudice even assuming such use in the light of our holding that the State properly elicited this evidence in rebuttal.

## VIII., IX.

■■ Defendant contends that the demonstration by Officer Scanlon in which he tied together the wires he found at the apartment so as to demonstrate the condition in which he found them was prejudicially misleading. We find nothing in the record to support his claim that this was intended to convey to the jury the false impression that defendant had tied the wires together in this manner. There was no testimony or argument to this effect. Officer Scanlon was clearly asked to show how he found the wires and in order to do so he tied them together; we find nothing misleading or prejudicial in that action. Nor do we find that the

trial court erred in permitting the display of these wires and of photographs of the deceased in the apartment to the jury during trial and for their use in deliberations. These exhibits helped to illustrate the manner and place in which the death occurred, and we find no abuse of discretion by the trial court in allowing their display to the jury. (*People v. Jenko* (1951), 410 Ill. 478, 102 N.E.2d 783; *People v. Newbury* (1972), 53 Ill. 2d 228, 290 N.E.2d 592.) Defendant notes that there was no dispute as to who killed Marsha Keshick. But the burden remained on the State to prove all elements of the crime, and thus the admission and display of these exhibits was permissible as an aid to the State in meeting that burden. Such exhibits have been found to be properly utilized even though a defendant admits the crime but pleads insanity (*People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310), or is willing to stipulate to the matters established by the evidence. *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771, *cert. denied* (1970), 396 U.S. 1016, 24 L. Ed. 2d 507, 90 S. Ct. 578.

### X.

Over defense objection the trial court gave the IPI instruction on confessions offered by the State. That instruction states:

> "You have before you evidence that the defendant confessed that he committed the crime charged in the indictment. It is for you to determine whether the defendant confessed, and, if so, what weight should be given to the confession. In determining the weight to be given to a confession, you should consider all of the circumstances under which it was made." (Illinois Pattern Jury Instructions, Criminal, No. 3.07 (1968).)

Defendant contends that he had only made admissions, not a confession, and thus this instruction prejudiced him by discouraging the jury from closely scrutinizing his statements.

It must be noted that although defendant objected to this specific instruction, the instructions which he offered and which the court rejected also stated that there was evidence that he confessed. Indeed, those instructions were virtually identical to that of the State except that they added language instructing the jury to consider defendant's state of mind at the time of the confession. A defendant cannot complain of error to which he has acquiesced or which he has invited. *People v. Riley* (1964), 31 Ill. 2d 490, 202 N.E.2d 531.

■■■ Even if defendant's claim is considered on the merits, we find no error in the instruction. A confession has been judicially defined as a comprehensive admission of guilt or of facts which necessarily and directly imply guilt. (*People v. Tennant* (1975), 32 Ill. App. 3d 1034, 337 N.E.2d 322, *affirmed* (1976), 65 Ill. 2d 401, 358 N.E.2d 1116, *cert. denied*

(1977), 431 U.S. 918, 53 L. Ed. 2d 229, 97 S. Ct. 2184; *People v. Rollins* (1970), 119 Ill. App. 2d 116, 255 N.E.2d 471.) In *Tennant* a defendant was held to have confessed when he told his interrogators he killed the deceased, described the murder weapon, and stated the reasons for attacking the victim. In one of the statements of the defendant introduced in this cause he stated that he strangled the deceased with an electrical cord after she told him she was seeing another man. The statement establishes all the elements of the crime without containing facts suggesting any defense. It is thus distinguishable from the statements found to be admissions in the cases cited by defendant, *People v. Horton* (1975), 35 Ill. App. 3d 208, 340 N.E.2d 700, *affirmed in part, reversed in part* (1976), 65 Ill. 2d 413, 358 N.E.2d 1121, and *People v. Sowell* (1965), 56 Ill. App. 2d 110, 205 N.E.2d 487. In *Horton* this court reversed a conviction for armed robbery in which a confession instruction was given because the defendant's statement contained only an admission that he took money from a cash register; he made no statement clearly indicating the use of force. On appeal our supreme court, without reaching the question of whether this was a confession, held that any error was harmless. In *Sowell* the statement at issue contained a clear admission that the defendant killed the deceased, but also contained facts strongly suggesting the possibility that the killing was in self-defense. As we have noted, in this cause defendant's statement contained all the facts establishing his guilt without providing any facts suggesting a possible defense. The fact that subsequently defendant sought to explain this behavior by establishing an insanity defense supported by psychiatric testimony and testimony concerning his past history does not require the statement to be viewed as an admission. As was stated in *Sowell*:

> "We do not mean to say that a requisite of a confession is that it negate every possible defense that might be contrived as an ingenious afterthought. However, where the statement itself includes facts which tend to indicate the existence of a defense, it cannot be said that the statement constitutes an admission of all necessary elements of the crime." (56 Ill. App. 2d 110, 118, 205 N.E.2d 487, 490.)

We find that the trial court properly instructed the jury on this issue.

## XI.

■■■■ The fundamental question at trial was that of defendant's sanity at the time of the offense. Of the two psychiatrists testifying for the defense, only Dr. Judas gave an opinion on this. Based on a hypothetical question which included much of the trial evidence about defendant's personal history, it was her opinion that the hypothetical person could not conform his conduct to the requirements of the law or appreciate the criminality of

his acts. In rebuttal Dr. Reifman disagreed with this opinion, based on a more restrictive hypothetical question asked by the State which centered on the events immediately surrounding the offense. This procedure was permissible, as the prosecution may only include facts favorable to its theory of the case in posing hypothetical questions to an expert witness. (*People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321, *cert. denied sub nom. Guido v. Illinois* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.) When on cross-examination defense counsel added such factors as the assumption that defendant only imagined hearing his girlfriend on the phone, Dr. Reifman indicated the hypothetical person was probably suffering from a mental disease, but he could not say whether that person could appreciate the criminality of his conduct or conform it to the law. The jury also heard the lay opinion of Officer Solke, who observed the defendant only hours after the occurrence; it was his opinion that defendant was sane on that date. Such nonexpert testimony by one with the opportunity to observe the defendant was properly presented to the jury. *People v. Banks* (1974), 17 Ill. App. 3d 746, 308 N.E.2d 261.

In addition to this opinion testimony there was ample evidence, if believed by the jury, to support the conclusion that defendant killed Marsha Keshick when he learned that she planned to leave him. As we have noted, defendant admitted in his testimony that he was jealous of Leon Mattigosh. He also testified that he killed Marsha after he heard her telling Mattigosh on the phone that she wanted to be with him. Although defendant maintains that this must have been delusionary because certain witnesses placed him at the scene later than the time Mattigosh recalled receiving the phone call, this presented a question of fact for the jury to determine along with the ultimate issue of defendant's sanity. Finally, in defendant's confession as related by Officer Wieclawek, defendant told Marsha just before he strangled her that if he could not have her nobody else could. All of this evidence tended to establish a jealousy-motivated killing rather than an unexplained, motiveless attack.

■■ This question of defendant's sanity at the time of the killing was a jury question. There was a conflict of opinion among the witnesses testifying to this, and the jury resolved the matter against the defendant. We find that their conclusion that defendant was sane was fully supported by the evidence and consequently will not disturb it. *People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752; *People v. Newbury* (1972), 53 Ill. 2d 228, 290 N.E.2d 592.

## XII.

Finally, defendant seeks reduction of his sentence of 15 to 30 years, contending that it was excessive. The comments of the trial court in

announcing sentence demonstrate a balanced concern for the rehabilitation potential of the defendant as well as the necessity of an adequate punishment for the crime committed. We find no abuse of discretion in the sentence imposed.

For the reasons above stated, the judgment is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.